# MILLER KORZENIK SOMMERS RAYMAN LLP
THE PARAMOUNT BUILDING • 1501 BROADWAY, SUITE 2015 • NEW YORK, NY 10036
TEL 212-752-9200 • FAX 212-688-3996 • WWW.MKSR.LAW

November 7, 2023

Hon. Edgardo Ramos
U.S. District Court, SDNY
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007

*via ECF*

   **re: Krans v. Thompson Literary Agency LLC, 1:23-cv-3696 (ER)**

Dear Judge Ramos,

  On behalf of Defendant/Counterclaim Plaintiff Thompson Literary Agency LLC, we request a pre-motion conference in anticipation of a motion for summary judgment asking the court to rule on interpretation of the contract at the center of this case. The issues in this case arise from that single contract: the 2020 agency agreement between TLA and Plaintiff. A decision on the contract would either terminate the case or—at a minimum—substantially narrow the issues and help the parties avoid extensive and unnecessary discovery costs.

**Background**
  This case arose after Plaintiff terminated her longtime agency relationship with Thompson Literary Agency—which she was fully entitled to do. After the termination, however, Plaintiff sought to compel TLA to continue providing services or to give up its fully earned commission. That commission comes from securing multiple deals with major publishers that have netted Plaintiff millions of dollars. Efforts to settle the dispute failed, both before and after the complaint was filed and in an SDNY mediation session held November 2.

**The Agency Agreement**
  The agency agreement and its post-termination provisions are the heart of this case. Accordingly, addressing the legal interpretation of the agreement in a motion at this point will be critical to overall resolution.
  Under the agreement, TLA had one job: to be the "sole and exclusive agent and representative" for Plaintiff "with respect to the sale, license or other disposition of the rights arising out of or in connection with" her work. The agreement states that TLA is entitled to commission in perpetuity for all such publishing deals. (See ECF No. 6-1.) The agreement sets the amount of the commission, emphasizing that it is irrevocable and that it is due regardless of who initiates or negotiates the deal:

> For services rendered by TLA in connection with Rights in and to the Work, the Author irrevocably assigns and agrees to pay to TLA, as an agency coupled with an interest, a commission equal to fifteen percent (15%) of all gross monies or other consideration, without deduction of any kind, due to the Author under any and all agreements relating to the Work or any Rights, whether they arise from an agreement initiated or negotiated by Agency or anyone else, including Author, and any extensions, modifications, renewals or substitutions thereof, except that the commission on the sale of foreign language publication rights, shall be twenty percent (20%).

Then, the agreement states that the commission continues after termination:

> This agreement may be terminated by either party upon thirty (30) days prior written notice to the other party, provided however that … TLA shall continue to be irrevocably entitled to receive directly from the applicable third party its commissions in the percentages referred to above on all monies derived from all dispositions of Rights in and to any Work which is the subject of a publishing or similar agreement entered into during the term of this agreement or within six (6) months thereafter with a publisher or other third party to whom TLA submitted the Work during the term of this agreement.

Notably, the agreement identifies no post-termination duties or responsibilities for TLA other than continuing to collect and pass on Plaintiff's royalties, which TLA has faithfully done.

The Court's review of this agreement would resolve or substantially narrow multiple issues in this case. The agreement itself answers the primary questions raised by the parties' claims, and the interpretation of that agreement is a matter of law. *See Stone v. Goodson,* 167 N.E.2d 328, 330 (1960) (stating that "construction of an unambiguous written contract is a question of law for the court").

**Declaratory judgment claims**

The agreement is a standard agency contract, and it reflects the law in New York. Although a principal can fire her literary agent at any time, "agents are paid for all work procured by them during their tenure as literary agents, regardless of the amount of work performed. When a literary agent is terminated, the agent continues to be paid a commission on any royalties received from deals negotiated by that agent." *Friedman v. Kuczkir*, 272 F. Supp. 3d 613, 618-19 (S.D.N.Y. 2017).

In *Friedman,* the court found that an author had breached her agency agreement by refusing to pay commission. Put simply, the court found that *the commission is earned when the agent procured the deal*. *Id.* at 631. No other answer makes sense. If an author could fire an agent after a deal was procured and then claim she doesn't have to pay because the agent doesn't work for her anymore, no agency agreement would matter. This is precisely why agency agreements exist.

The publishing deals at issue in this case were unquestionably the result of TLA's negotiations. Consequently, TLA is entitled to full commission on sales of the works covered by those agreements, as Plaintiff's counsel expressly acknowledged in his termination letter. ("As everyone knows, there are multiple existing streams of income. The expectation is that TLA will still collect revenue on these, take its commission and pay Kim what she is owed.") Although the

complaint attempts to make an issue of the fact that TLA did not make the initial contact—a single email—with Plaintiff's first tarot card publisher, that is legally irrelevant. As the language of the agreement and the law make clear, the required commission applies to that deal and all others in this case. The complaint attempts to avoid this conclusion by interpreting the phrase "services rendered" in the agreement to mandate some ongoing obligation. When an author agrees to pay an agent for "services rendered," the payment is for work already completed. Both practically and grammatically, "services rendered" is past tense. Indeed, the agent receives *no pay at all* until a deal is struck. But once the deal is secured, the commission is irrevocable, as the agreement states.

The Court's interpretation of the agreement would resolve the declaratory judgment counts in both the complaint and the counterclaim.

**Breach claims**

The agency agreement is also central to the remaining claims in the complaint, for breach of contract and breach of fiduciary duty.

Plaintiff's effort to avoid her obligations under the agency agreement cannot succeed because her complaint points to no breach, let alone the kind of breach that "goes to the root of the contract," as required to maintain her claim. *See In re Lavigne*, 114 F.3d 379, 387 (2d Cir. 1997). As noted above, TLA's role under the agreement was to negotiate sale or licensing of rights for Plaintiff's work. TLA did that—repeatedly and with great success. The agency agreement identifies many of the works TLA successfully placed with major publishers, and the complaint notes that Plaintiff "made good money through this relationship." ECF No. 3 ¶ 18. Indeed, the complaint identifies not a single issue with the relationship until 2022. *Id.* ¶ 19. And the issues it does point to are not duties under the agreement and cannot constitute a breach. Further, by 2022, TLA had successfully negotiated deals for every single one of the works at issue in this case. Thus, TLA fully performed under the agreement and its commission is fully earned. The complaint points to nothing that can constitute a breach.

Nor does the complaint support a claim for breach of fiduciary duty. The agreement itself outlines TLA's duties to Plaintiff, and merely recasting a contract claim in tort language cannot create a tort claim. *See Non-Linear Trading Co. v. Braddis Assocs., Inc.*, 243 A.D.2d 107, 116 (1998). In any event, the issues cited in the complaint cannot constitute a breach of any duty. It is not a breach of fiduciary duty for an agent or publisher to work with multiple authors in the same genre. *See Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Pub. Co.*, 281 N.E.2d 142, 144 (1972). Indeed, an agent's deep knowledge of a particular area is an asset to authors. And package design is controlled by the publisher, not the agent, and cannot form the basis of any breach claim.

Accordingly, TLA asks the Court to schedule a pre-motion conference to address its proposed motion.

cc: Counsel of record via ECF                                   Respectfully submitted,


                                                                 /s/ Mona Houck
                                                                Mona Houck
                                                                David S. Korzenik