UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KIM KRANS,

    Plaintiff,

v.

THOMPSON LITERARY AGENCY LLC,

    Defendant.

Case No. 1:23-cv-03696-ER

**ORAL ARGUMENT REQUESTED**

**DEFENDANT'S REPLY
MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTION
FOR SUMMARY JUDGMENT**

Mona Houck
David S. Korzenik
MILLER KORZENIK SOMMERS RAYMAN LLP
1501 Broadway, Suite 2015
New York, NY 10036
(212) 752-9200
mhouck@mkslex.com
dkorzenik@mkslex.com

*Attorneys for Defendant*
*THOMPSON LITERARY AGENCY LLC*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................................ ii

ARGUMENT ........................................................................................................................................ 1

    I.    THE MEANING OF THE PARTIES' AGENCY AGREEMENT IS CLEAR ............ 1

    II.   PLAINTIFF CANNOT SHOW A BREACH
        OF THE CONTRACT'S CLEAR TERMS ................................................................. 5

    III.  PLAINTIFF HAS NO SUPPORT FOR A BREACH
        OF FIDUCIARY DUTY CLAIM ................................................................................ 7

        Plaintiff Cannot Show Misconduct by TLA .................................................................. 7

        Plaintiff Cannot Show Damages, Let Alone Damages Caused by TLA ....................... 9

CONCLUSION ................................................................................................................................... 10

# **TABLE OF AUTHORITIES**

*Fleming v. Fleming*,
  137 A.D.3d 1206 (1st Dep't 2016) ............................................................................................5

*Friedman v. Kuczkir*,
  272 F. Supp. 3d 613 (S.D.N.Y. 2017) ...................................................................................3, 4

*Goenaga v. March of Dimes Birth Defects Found.*,
  51 F.3d 14 (2d Cir. 1995) .........................................................................................................7

*Greenfield v. Philles Records, Inc.*,
  780 N.E.2d 166, 170 (2002) .....................................................................................................5

*Innophos, Inc. v. Rhodia, S.A.*,
  832 N.Y.S.2d 197 (2007) ..........................................................................................................1

*Kurtzman v. Bergstol*,
  835 N.Y.S.2d 644 (2007)...........................................................................................................7

*New York City Off-Track Betting Corp. v. Safe Factory Outlet, Inc.*,
  809 N.Y.S.2d 70 (2006).............................................................................................................1

*Peter Lampack Agency, Inc. v. Grimes*,
  939 N.Y.S.2d 409 (2012).......................................................................................................4, 5

*Peter Lampack Agency, Inc. v. Grimes*,
  958 N.Y.S.2d 310 (Sup. Ct. 2010)............................................................................................4

*Van Wagner Advert. Corp. v. S & M Enter.*,
  492 N.E.2d 756 (1986) .............................................................................................................1

*William C. Atwater & Co. v. Panama R. Co.*,
  159 N.E. 418 (1927) .................................................................................................................2

Defendant Thompson Literary Agency LLC ("TLA") respectfully submits this reply memorandum of law in further support of its motion for summary judgment. ECF No. 24.

## ARGUMENT

### I. THE MEANING OF THE PARTIES' AGENCY AGREEMENT IS CLEAR

The Court's entry of a declaratory judgment on the meaning of the Agency Agreement would resolve the core dispute in this case, and Plaintiff's arguments show that such a resolution is necessary to prevent pointless future litigation.

The language of the Agreement is clear and unambiguous: TLA is entitled to commission on any money due to Plaintiff under any existing publishing contract and any amendment, extension, modification, renewal, or substitution of those contracts. Plaintiff's effort to rely on extrinsic evidence or her own bare assertions to skew the interpretation of the Agreement should be disregarded. *Innophos, Inc. v. Rhodia, S.A.*, 832 N.Y.S.2d 197, 199 (2007) (citations omitted) ("[E]xtrinsic and parol evidence is not admissible to create an ambiguity."); *New York City Off-Track Betting Corp. v. Safe Factory Outlet, Inc.*, 809 N.Y.S.2d 70, 73 (2006) ("[M]ere assertion by a party that contract language means something other than what is clear when read in conjunction with the whole contract is not enough to create an ambiguity sufficient to raise a triable issue of fact."). Whether a contract is ambiguous is a question of law for a court to resolve. *Van Wagner Advert. Corp. v. S & M Enter.*, 492 N.E.2d 756, 759 (1986).

The Agreement is not a complicated one, and its post-termination provisions are likewise clear. ECF No. 6-1. Yet Plaintiff has sought to twist its terms, ignore the post-termination provisions, and avoid consideration of the Agreement as a whole. The law requires otherwise. "Particular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby." *William C. Atwater & Co. v. Panama R. Co.*, 159 N.E. 418, 419 (1927).

Plaintiff isolates the phrase "services rendered" to fuel her circular, absurd argument that TLA is not entitled to commission on works it has sold because TLA is no longer working for her. Opp'n Mem., ECF No. 34 at 6. This disregards the fact that Plaintiff fired TLA. Following this interpretation would render the post-termination provisions of the Agreement meaningless.

First, "services rendered" is past tense and the plain meaning does not impose a continuing obligation on the agent. If the parties intended to require that, they could have done so by including the common contractual phrase "and to be rendered" or any similar term.

More important, the language of the Agreement must be viewed as a whole. *See* ECF No 6-1. The post-termination provisions are laid out in this paragraph:

> This agreement may be terminated by either party upon thirty (30) days prior written notice to the other party, provided however that, (i) TLA shall be entitled to carry out and/or complete any negotiations with any publisher who is considering the Work as of the termination date, and (ii), *TLA shall continue to be irrevocably entitled to receive directly from the applicable third party its commissions in the percentages referred to above on all monies derived from all dispositions of Rights in and to any Work which is the subject of a publishing or similar agreement entered into during the term of this agreement* or within six (6) months thereafter with a publisher or other third party to whom TLA submitted the Work during the term of this agreement. *Such post-termination entitlement to commissions shall include without limitation commissions on advances, royalty and income earnings under such publishing or similar agreement as well as subsidiary and ancillary rights earnings, whenever negotiated or received, whether during or after the term of this agreement, for the life of the copyright therein, and including any monies received in connection with any extensions, modifications, renewals or substitutions of any such agreements for the disposition of such Rights.*

*Id.* at 2 (emphasis added). The Agreement does not, as Plaintiff argues, ECF No. 34 at 6, require TLA to provide ongoing services to receive this commission. Nor does it limit commissions to a particular version of a work, as Plaintiff also argues. *Id.* at 9. Rather, the Agreement focuses on the *rights* disposed of under *contracts* negotiated by TLA. TLA is entitled to its commission on *any* earnings that flow to Plaintiff from *any* existing publishing contract (or any extension, etc.).

New York law also dictates this outcome. "When a literary agent is terminated, the agent continues to be paid a commission on any royalties received from deals negotiated by that

2

agent." *Friedman v. Kuczkir*, 272 F. Supp. 3d 613, 618-19 (S.D.N.Y. 2017). Plaintiff states that she agrees with this "standard principle of agency law," ECF No. 34 at 5, but seeks to avoid both that principle and the clear language of the Agreement by arguing that TLA would not be entitled to commission on a hypothetical "materially different" work, describing at length details she envisions would make a work "materially different" and raising the potential for endless future litigation over whether an anniversary edition, for example, is "materially different" than the initial work. This is a sideshow that demonstrates the need for a declaratory judgment.

The only relevant question is whether the hypothetical future work is one to which TLA has already sold the rights. In other words, are the rights part of "deals negotiated by [the] agent"? *Friedman*, 272 F. Supp. 3d at 618-19. If so, TLA's commission was earned at the time of the deal. If not—*i.e.*, if the rights are to a wholly new work under a new contract—TLA has not earned commission. That is all TLA asks the Court to decide.

Plaintiff confuses completion of the "deals" to which the law applies with completion of products resulting from those deals. Whether Plaintiff feels she needs a new agent to see a product through to publication is immaterial. The Agreement and the case law govern.

In *Friedman,* the agent didn't even see the contract through to execution, let alone provide "services" for the five books the contract covered. *Id.* Yet the court said that was "irrelevant because it is plain that Friedman was the 'procuring cause' of that contract." *Id.* TLA was without question the procuring cause of the eight publishing contracts in this case. Plaintiff agrees that TLA negotiated these contracts. SMF ¶¶ 8, 11, 20, 28, 36, 42, 48, 52. She is legally obligated to continue paying TLA commission on any money that flows from those contracts.

Highlighting a misunderstanding of her own contracts and the law, Plaintiff argues that it could be a factual issue whether TLA would be the procuring cause of any hypothetical "materially different editions to be published." ECF No. 34, fn 1 at 8. But the question is not

3

whether an agent was the procuring cause of any "edition" or "version," but whether the agent negotiated the contract under which that work is published. *Friedman*, 272 F. Supp. 3d at 630.

The publishing contracts here grant the publishers all rights in the physical and digital versions of the works. *See, e.g.,* SMF ¶ 13. This means, for example, that the publishers acquired in a single contract the rights not only to the main decks but also to the pocket deck versions—and any other versions. *Id.* Although the Agreement and the case law make this clear, it is notable that the publisher made this point explicitly about Plaintiff's *Archetypes Pocket Deck*. Asked about its starting work on that deck without agreement from Plaintiff, Harper stated: "This format is included under the terms of the overall agreement; we have rights to all book formats." ECF No. 27-25. Thus, Plaintiff's lengthy description of the differences between the main deck and the pocket deck is completely immaterial. ECF No. 34 at 7. That pocket deck was part of a contract TLA negotiated, and TLA is guaranteed commission on any royalties Plaintiff earns from that contract.

Plaintiff relies on the *Grimes* case but disregards or misinterprets its findings. There, an agent claimed he was owed commission on a work published under a contract he did not negotiate and on extensions of contracts when he had no stated rights to extensions. *Peter Lampack Agency, Inc. v. Grimes*, 939 N.Y.S.2d 409, 410 (2012). Neither situation applies here.

First, at issue in *Grimes* was a new work, not another version of the work covered by the contract the agent had negotiated. The agent argued that the publisher's "option clause" on the author's next book bound the author to pay him commission on that book. *Peter Lampack Agency, Inc. v. Grimes*, 958 N.Y.S.2d 310 (Sup. Ct. 2010). The trial court found (and the Appellate Division affirmed) that the agency clause guaranteed commission on money due to the author *under that agreement*—not under future agreements. *Id*. That is precisely the finding TLA seeks: If Plaintiff creates a new work under a new publishing contract—rather than a work

4

covered by existing contracts—TLA is not entitled to commission. But Plaintiff cannot avoid her obligation to pay commission on any money she earns *from existing contracts TLA negotiated.*

Second, the *Grimes* parties had no provision for commission on contract extensions. The court noted that had the parties meant to do that, "they would have said so." 939 N.Y.S.2d at 410. Here, the parties have said so. The Agreement guarantees TLA commission on all money due to Plaintiff under current contracts and "*any extensions, modifications, renewals or substitutions thereof.*" ECF No. 6-1 at 1-2. This guarantee continues post-termination. *Id.*

If an agreement is "complete, clear and unambiguous," it "must be enforced according to the plain meaning of its terms." *Greenfield v. Philles Records*, Inc., 780 N.E.2d 166, 170 (2002). TLA renews its request for the Court to enforce the terms of the Agreement: TLA is entitled to commission on any money due to Plaintiff under any existing publishing contract and any amendment, extension, modification, renewal, or substitution of those contracts.

## II. PLAINTIFF CANNOT SHOW A BREACH OF THE CONTRACT'S CLEAR TERMS

Plaintiff's opposition on the breach of contract claim simply repeats unsupported allegations from her complaint and seeks to use those bare allegations to claim the Agreement is ambiguous. But Plaintiff's extrinsic view of the Agreement is irrelevant, and assertions of those views do not create ambiguity precluding summary judgment.[1] *Fleming v. Fleming*, 137 A.D.3d 1206, 1207 (1st Dep't 2016) (parties' intent must be "construed from the four corners of the agreement"). The Agreement supersedes any other agreement or understanding between the

---

[1] Plaintiff's effort to find ambiguity in the Agreement based on TLA's reference to the publishing contracts must also fail. *See* ECF No. 34 fn 2 at 12. The publishing contracts do not determine the meaning of the Agreement or its obligations, but they identify the rights disposed of and are an additional demonstration of Plaintiff's legal obligation to pay TLA the commission it is owed. The Agreement itself makes clear that publishing contracts could not create any ambiguity: "In the event of a conflict between the provisions of this agreement any agency clause in any publishing or third party agreement relating to the Work, this agreement shall control." ECF No. 6-1 at 2.

parties, ECF No. 6-1 at 1, and it can only be modified in writing. *Id.* at 2. Thus, the Agreement itself outlines the parties' obligations, and a claim of breach must be assessed based on its terms.

No act or omission Plaintiff alleges could reasonably be considered a material breach. Nothing she complains of is required by or even referenced in the Agreement. The Agreement's purpose is just what it says: to designate TLA as Plaintiff's agent "with respect to the sale, license or other disposition of the rights" connected to Plaintiff's work. ECF No. 6-1 at 1. Plaintiff agrees this is "the essence of the Agreement." ECF No. 34 at 10. The Agreement does not obligate TLA to perform marketing, publicity, editorial, or personal services. ECF No. 6-1. And Plaintiff has utterly failed to allege a breach of anything the Agreement *does* require. It is beyond absurd, for example, to claim that not notifying Plaintiff of a publication date could establish a breach. And Plaintiff admits she knew the date because the publisher informed her directly on multiple occasions. *See* Reply Statement of Material Facts ("SMF") ¶¶ 77-79. Nor can the fact that Meg Thompson often personally responded to emails somehow create an obligation under an Agreement that requires no such act. Remarkably, Plaintiff even argues that not pitching new ideas is a breach—even though the Agreement explicitly states that taking on new products is an option, not an obligation. ECF No. 6-1 at 1.

In short, nothing Plaintiff has alleged constitutes a breach of the Agency Agreement. Plaintiff admits that she has no complaint about TLA from the beginning of their relationship until 2022. ECF No. 34 at 11. The final publishing contract TLA negotiated on Plaintiff's behalf was completed in August 2021. SMF ¶ 52. Those lucrative publishing contracts are precisely the benefit Plaintiff could justifiably have expected from the Agency Agreement.

Plaintiff needed absolutely no reason to terminate her agency relationship with TLA. ECF No. 6-1 at 2. But she must have legal justification for asserting a breach of the Agreement, and that she has failed to show. Her claim for breach of contract must fail.

### III. PLAINTIFF HAS NO SUPPORT FOR A BREACH OF FIDUCIARY DUTY CLAIM

Plaintiff's entire argument that TLA breached any fiduciary duty is devoid of admissible evidence other than her bare declaration. ECF No. 35. In turn, her declaration is based on inadmissible speculation, conclusions, and contradictory allegations. That falls far short of raising a triable issue. *See Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (in opposing summary judgment, the nonmoving party "may not rely simply on conclusory statements" or "conjecture or surmise"). Plaintiff "must prove the existence of a fiduciary relationship, misconduct by the defendant, and damages that were directly caused by the defendant's misconduct." *Kurtzman v. Bergstol*, 835 N.Y.S.2d 644, 646 (2007). She cannot establish misconduct or any causal connection to TLA, and her claim must fail.

**Plaintiff Cannot Show Misconduct by TLA**

No evidence supports the allegation that TLA made packaging decisions or in any way influenced packaging design for Plaintiff or any other client. Plaintiff's "evidence" in her declaration boils down to this: TLA was involved in her work, and "[t]his treatment wasn't specific to me, I know Meg and TLA helped Grace Duong and Sarah Shipman, amongst others, with their packaging. I know this because after the success of *The Wild Unknown* in 2016, other authors represented by Meg and TLA started using the exact packaging that I developed." ECF No. 35 ¶ 28. Conclusory speculation is not evidence and does not create a triable fact. *Goenaga*, 51 F.3d at 18.

Nothing supports Plaintiff's claims that TLA "oversaw" her package design process. ECF No. 34 at 18; ECF No. 35 ¶ 25. She says she worked with the publisher for 11 months, "providing sketches, descriptions, and examples," then "giving feedback and notes until the final design elements were in place." ECF No. 35 ¶¶ 25-26. Plaintiff claims "Meg was cc'd on all of these emails" and "Meg was typically included on all email correspondence." *Id.* ¶¶ 26-27. "The development required extensive back-and-forth." ECF No. 34 at 18. From these 11 months of

7

extensive email exchanges, she found three exhibits that allegedly support her claim. Exs. E (ECF No. 36-5), F (No. 36-6), and J (No. 36-10). Exhibit E is an email Plaintiff wrote, then asked TLA to forward to the publisher. It attaches images of the packaging prototypes Plaintiff and the publisher had apparently discussed, which Plaintiff noted she included "for Meg so she knows what we're talking about." Exhibit F is an email from the publisher to Plaintiff; Plaintiff replied. TLA was copied but did not respond. Exhibit J is a chain of 10 emails that starts with a message from the publisher to Plaintiff about prototypes. TLA is copied on the initial email and Plaintiff's first response. Every other email is only between Plaintiff and the publisher.

From 11 months of back and forth in email, Plaintiff's evidence that TLA "oversaw" the process of designing the packaging does not include a single comment or request for input from TLA. Plaintiff alleges TLA gave this same "treatment" to other clients with similar packaging. ECF No. 35 ¶ 28. But this "treatment" establishes absolutely no role for TLA in packaging decisions. And this is Plaintiff's entire basis to claim she *knows* TLA directed other clients' decisions. Again, speculation and conclusions are not evidence and do not create issues of fact.

It is immaterial that TLA *knew* about Plaintiff's packaging decisions because she was included on these emails. ECF No. 34 at 16. And it is irrelevant that other authors' packaging is similar to Plaintiff's.[2] Published material is not a trade secret. Plaintiff has no proprietary or copyright interest in this packaging, yet seeks to control it. Anyone can look at her products and draw inspiration from them, as Plaintiff herself did in referencing products published before her own. *See* Def.'s MSJ, ECF No. 24 at 19-20. That she made changes—for example, eliminating

---

[2] Plaintiff cites Sarah Shipman's *Our Tarot* as one of two examples of this alleged "copying." ECF No. 34 at 16. The publisher is HarperCollins. (The Court may take judicial notice of this from Harper's website: https://shorturl.at/cekA0.) This is Plaintiff's publisher for her first decks. It is not surprising that the same publisher would use similar packaging for similar works, particularly given that the publisher also claims copyright in the package. *See* SMF ¶ 24.

8

thumbholes—to create her final product is immaterial. She has utterly failed to show any misconduct by TLA, as she must to sustain her claim.

Plaintiff's efforts to create an issue of fact by pointing to "evidence" drawn from conversations must also fail. ECF No. 34 at 20. Plaintiff describes no conversation in which TLA referred to assisting or encouraging any other client in using Plaintiff's packaging. Rather, she alleges Ms. Thompson said that "publishers 'wanted what I had' with the success of *The Wild Unknown*," that "fellow authors and publishers were 'chasing' what I created," and that "other authors, agents, and publishers would bring up my name as a model for success." ECF No. 35 ¶¶ 47, 50; ECF No. 34 at 20. Hardly controversial given Plaintiff's "global success," ECF No. 34 at 3, but certainly not the basis of any claim. Plaintiff alleges that Ms. Thompson "apologized" for "representing other tarot authors and creating competitive works" and said she was "officially done selling decks." *Id.* ¶ 53. Even if this were true, it provides no support for Plaintiff's claim that TLA inappropriately encouraged other authors to use her packaging. And TLA has no duty to refuse to represent any client other than Plaintiff.

**Plaintiff Cannot Show Damages, Let Alone Damages Caused by TLA**

Plaintiff's claim that she has suffered damages is not only conclusory and speculative but ludicrous and misleading. She says her "first decline in sales came after 2018, the year Meg and TLA helped Grace Duong publish *Mystic Mondays*." ECF No. 35 ¶ 57; Pl.'s SMF ¶ 46. She then reaches the incredible conclusion that she "lost over $183,000 in sales." ECF No. 35 ¶ 60. She provides no basis for calculating this loss. Bare speculation does not establish damages. Plaintiff's royalty statements show she is referring only to sales of her first deck, *The Wild Unknown Tarot.* In 2019, sales of the deck, according to Plaintiff's exhibit, ECF No. 36-11, declined slightly, by just under $19,000. Plaintiff conveniently leaves out that she published

9

another deck of her own in 2018, and that sales of that deck in 2019 were just over $200,000.[3] She has provided no basis for concluding that a drop in sales for *one* of her decks is directly attributable to *Mystic Mondays*, and not to the natural decline for any work after multiple years on the market, or to the introduction of her own obviously competing work, or to the hundreds of other tarot products on the market, or to many other things.[4] Crucially, she has shown absolutely no link between this purported loss and any action by TLA. Her claim must therefore fail.

Plaintiff was of course not required to have an agent who represents other authors in her genre. She was at all times free to terminate the Agency Agreement. She admits she knew of TLA's representation of authors she views as competitive since 2018. Pl.'s Statement of Additional Facts, ¶ 46. She also says she was happy with TLA's representation until 2022. ECF No. 34 at 11. If she had any legitimate complaint about TLA representing other tarot authors—and she does not—it is waived. Her effort to manufacture a claim now should be rejected.

## CONCLUSION

For the reasons above, Defendant respectfully requests that the Court grant its motion for summary judgment and grant fees and such other and further relief as it deems just and proper.

| | |
|---|---|
| Dated:  New York, New York<br>February 16, 2024 | Respectfully submitted,<br>MILLER KORZENIK SOMMERS RAYMAN LLP<br><br>By:  /s/ Mona Houck<br>Mona Houck (mhouck@mkslex.com)<br>David S. Korzenik (dkorzenik@mkslex.com)<br><br>1501 Broadway, Suite 2015<br>New York, NY 10036<br>(212) 752-9200 |

---

[3] *See* Pl. Ex K, ECF No. 36-11. Sales of *The Wild Unknown* totaled $323,756 in 2018, *id.* at 10 and 16, and $304,962 in 2019, *id.* at 21 and 26. Sales of the newer deck, *Animal Spirit*, were $200,274 in 2019. *Id.* at 22 and 27.
[4] The Court may take judicial notice of the hundreds of tarot decks on sale, *see* https://www.amazon.com/tarot-decks/s?k=tarot+decks, as well as to the top tarot sellers, https://www.amazon.com/Best-Sellers-Tarot/zgbs/books/12659, which, as of Feb. 15, 2024, show Plaintiff with five of the top 50 decks. (*Mystic Mondays*, which Plaintiff alleges took away sales, is not in the top 50, nor is *Our Tarot*, the only other deck Plaintiff targets.)