Mona Houck
David S. Korzenik
MILLER KORZENIK SOMMERS RAYMAN LLP
1501 Broadway, Suite 2015
New York, NY 10036
(212) 752-9200
mhouck@mkslex.com
dkorzenik@mkslex.com

*Attorneys for Defendant*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KIM KRANS,<br><br>    Plaintiff,<br><br>        v.<br><br>THOMPSON LITERARY AGENCY LLC,<br><br>    Defendant. | Case No. 1:23-cv-03696-ER |

## DEFENDANT'S REPLY TO PLAINTIFF'S RULE 56.1 STATEMENT REPONSE AND RESPONSE TO PLAINTIFF'S COUNTERSTATEMENT OF FACTS

Pursuant to Local Rule 56.1 and in further support of its motion for summary judgment,

Defendant Thompson Literary Agency LLC ("TLA") respectfully submits this reply to

Plaintiff's Response to Defendant's Statement of Material Facts and response to Plaintiff's

Counterstatement of Material Facts.

## PRELIMINARY STATEMENT

**Plaintiff's Responses:** Many of Plaintiff's responses to TLA's statements of fact include

argumentative and conclusory contentions about the relevance of material in the record.

Accordingly, Plaintiff has included a brief reply to those statements below. In the interest of

providing the Court with a single document to refer to, TLA has included every initial statement and response below, even if it has no reply.

**Plaintiff's Additional Statement of Facts:** Many of Plaintiff's purported factual statements are argumentative, speculative, conclusory, and not based on personal knowledge or other admissible evidence. TLA asks the Court to disregard those responses.

Even more troubling, the bulk of Plaintiff's purported factual statements are based on nothing more than her own largely hearsay-based declaration that includes extensive detail she is presenting for the first time. To the extent the declaration is based on information that Plaintiff should have produced as support for her claim under Fed. R. Civ. P. 26(a) or in response to TLA's discovery requests under Rule 26(e), the declaration should be stricken. In particular, ¶¶ 28-45 of the declaration, ECF No. 35, and the statements of facts that rely on those paragraphs, include information that should have been provided in discovery.

Rule 37(c) provides that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." *See Irish v. Tropical Emerald LLC*, 2021 WL 5899048, at *3 (E.D.N.Y. Dec. 14, 2021), *citing Ebewo v. Martinez*, 309 F. Supp. 2d 600, 608 (S.D.N.Y. 2004) ("A party cannot sandbag its adversary by submitting new facts in a summary judgment declaration, if those facts should have been disclosed during fact discovery.") *See also Bynum v. Metro. Transp. Auth*., 2006 WL 6555106, at *4 (E.D.N.Y. Nov. 21, 2006) ("To the extent that the defendant intends to use information, be it documents or testimonial evidence, to support a claim or defense, defendant is required to disclose this information without awaiting a request. Fed.R.Civ.P. 26(a). Plaintiff is not required to ask for this information.")

Plaintiff's responses to TLA's discovery requests were evasive and incomplete.[1] For example, Interrogatory No. 1 asked Plaintiff to identify in detail "each act or omission" that she contended supported any breach of the Agency Agreement. ECF No. 27-22. Plaintiff responded with six legally irrelevant sentence fragments complaining of actions she claims breached the contract, including alleged acts TLA was never legally obligated to perform and alleged omissions that occurred *after* Plaintiff fired TLA as her agent. *Id.*

Her further responses were even more evasive.

**Interrogatory No. 2 asked this:**

> If you contend that TLA breached any duty to you, please identify in detail each act or omission you assert supports that contention.

**The entirety of Plaintiff's response was this:**

> TLA not only breached its duties as set forth in in No 1 above, but it also breached its duty to Krans by directly working with competitors of Krans and using materials Krans developed for her own business for use with competitors.

**Interrogatory No. 4 asked this:**

> If you contend that any aspect or feature of the packaging of your work has been copied by another tarot author or publisher, please identify the specific product you contend has been copied, the work you contend has copied it, and the specific aspects or features you contend have been copied.

**The entirety of Plaintiff's response was this:**

> Two or more competitors who are clients of Defendant use the exact packaging created with Kim's material input and authorship, as well as various content.

---

[1] TLA served interrogatories and requests for documents on September 28, 2023. Plaintiff asked TLA for an extension to respond, and the parties agreed to extend the deadline to December 13, 2023. Plaintiff served her responses on December 14, 2023. The responses are available at ECF Nos. 20 and 22.

**Interrogatory No. 5 asked this:**

> Regarding each instance of copying you have identified or described in
> your answer to Interrogatory 4, state whether the specific aspects or
> features you contend have been copied are original to you or whether they
> were derived from any other sources, persons, or pre- existing works.

**The entirety of Plaintiff's response was this:**

> Plaintiff's designs are original creations.

**Interrogatory No. 6 asked this:**

> Regarding each specific aspect or feature you contend was copied in your
> answers to Interrogatories 4 and 5, set forth the facts that establish the
> basis for its originality, or, in the alternative, identify the sources, persons,
> or pre-existing works from which it was derived.

**The entirety of Plaintiff's response was this:**

> Kim personally was engaged in creating all aspects of the original packaging and
> features with input from Harper. Documents corroborating this will be produced.

**Interrogatory No. 7 asked this:**

> If you contend that TLA had a role in any instance of copying you addressed in
> your answers to Interrogatories 4 and 5, please describe in detail the actions you
> allege TLA took.

**The entirety of Plaintiff's response was this:**

> Meg was intimately aware of Kim's unique designs and Kim's creation of
> those designs and the two had multiple discussions about those unique
> creations and how they were cutting edge and new in the industry. Meg
> has refused to produced communications with her other clients, but given
> how Meg operated with Kim in the past, Meg undoubtedly was fully
> aware and gave her input into every author's designs and either directly
> assisted or gave a nod of approval for the copied designs.

In short, while providing only a bare conclusory allegation that TLA had any input

whatsoever on *any* client's design, including her own, Plaintiff refused to identify what she

claimed was copied from her works, or to produce even the slightest suggestion of any actual

support for her blanket claim that TLA had a role in another author's design choices.

4

Plaintiff was similarly evasive in her responses to document requests 2, 3, 13 and 14. ECF No. 27-20. Her boilerplate answer was "These were all verbal communications so no documents." *Id.* That response would make forthright and specific answers to the interrogatories above all the more important. Yet she provided no information about these alleged "verbal communications" in her interrogatory responses. And she produced a total of 92 pages of documents before the date of the response to her motion, none of which show TLA had *any* role in *any* packaging design (or that Plaintiff has any protectable, proprietary interest in this design).

Upon filing her response to TLA's motion for summary judgment, however, Plaintiff suddenly had much more information—information that should have been provided in response to the discovery requests or without request if she believed it supported her claim. *See* FRCP 37(c). Plaintiff's declaration has multiple paragraphs providing details about specific aspects of her purportedly original designs and providing other new information. Similarly, she submitted five exhibits (G-K, ECF Nos. 36-07–11) based on documents that she did not produce until the same day she filed the response.

This additional information does not support Plaintiff's claims or create any triable issue of material fact because details of her effort in creating her packaging does not demonstrate any wrongdoing by TLA or any causal link to TLA as required for her claims. But Plaintiff's effort to introduce details it previously withheld in an effort to create the illusion of a triable issue of fact should be disregarded. Plaintiff has utterly failed to take her discovery obligations seriously while imposing excessive costs on TLA for its own genuine discovery efforts and litigation of this case. TLA asks this Court to disregard all information Plaintiff should have provided in discovery and now seeks to rely on and to reject her effort to use irrelevant and immaterial details to falsely manufacture factual issues and prolong this unsupported case.

## REPLY TO PLAINTIFF'S RULE 56.1 STATEMENT RESPONSES

For its reply to Plaintiff's Rule 56.1 Statement Response, Defendant states as follows:

*The Parties*

1.      Defendant Thompson Literary Agency LLC ("TLA") is a New York agency owned and founded by Meg Thompson. First Am. Compl. ("FAC") ¶ 6.

**ANSWER:** This statement is not disputed for purposes of summary judgment.

2.      In 2014, Meg Thompson began representing Plaintiff Kim Krans, who was until that time a self-published author. Decl. of Meg Thompson ("Thompson Decl.") ¶ 2; FAC ¶ 5.

**ANSWER:** This statement is not disputed for purposes of summary judgment.

*The Agency Agreement Defines the Relationship*

3.      At Plaintiff's insistence, the parties revised the terms of their relationship in 2020 in an agreement ("the Agency Agreement") negotiated by Plaintiff's counsel Jeffrey Kass. Thompson Decl. ¶ 36; ECF No. 6-1.

**ANSWER:** Plaintiff admits that the parties entered into the Agency Agreement in 2020. However, Attorney Jeffrey Kass only negotiated ancillary rights not at issue in this litigation. He had no involvement in the commission or services language drafted by TLA. Decl. of Kim Krans ("Krans Decl."), ¶ 7.

**TLA'S REPLY:** Plaintiff's additional response is undisputed only for the purposes of this motion and is immaterial to the issues before the Court.

4.      That Agency Agreement is the only agreement between the parties relevant to this lawsuit. FAC ¶¶ 18.

**ANSWER:** Denied; there are a number of agreements between the parties relevant to this lawsuit, including those referenced in Defendant's Exhibits A-H.

**TLA'S REPLY:** Paragraph 4 is undisputed in all material respects. TLA agrees that the contracts referenced in its Exhibits A-H are relevant to this lawsuit. But those publishing contracts are not *between the parties*—they are between Plaintiff and her various publishers.

5.      The Agency Agreement includes these relevant provisions (ECF No. 6-1):

   a.   It designates TLA "as the sole and exclusive agent and representative" for covered works "with respect to the sale, license or other disposition of the rights arising out of or in connection with the Work as follows: English language publication, foreign language publication, serial and audio rights, internet, electronic, calendars, journals, blank books, notecards, greeting cards, other paper products, games and art prints/posters."

   b.   It "irrevocably assigns and agrees to pay to TLA, as an agency coupled with an interest, a commission equal to fifteen percent (15%) of all gross monies or other consideration, without deduction of any kind, due to the Author under any and all agreements relating to the Work or any Rights, whether they arise from an agreement initiated or negotiated by Agency or anyone else, including Author, and any extensions, modifications, renewals or substitutions thereof, except that the commission on the sale of foreign language publication rights, shall be twenty percent (20%)."

   c.   It "irrevocably authorizes TLA to receive by direct payment in TLA's name of all monies due or to become due to the Author with respect to the Work or any Rights."

   d.   It allows for either party to terminate the agreement with thirty days written notice to the other party.

   e.   It states that upon termination:

       i.   "TLA shall be entitled to carry out and/or complete any negotiations with any publisher who is considering the Work as of the termination date"; and

ii.   "TLA shall continue to be irrevocably entitled to receive directly from the applicable third party its commissions in the percentages referred to above on all monies derived from all dispositions of Rights in and to any Work which is the subject of a publishing or similar agreement entered into during the term of this agreement or with six (6) months thereafter"; and

iii.   "Such post-termination entitlement to commissions shall include without limitation commissions on advances, royalty and income earnings under such publishing or similar agreement as well as subsidiary and ancillary rights earnings, whenever negotiated or received, whether during or after the term of this agreement, for the life of the copyright therein, and including any monies received in connection with any extensions, modifications, renewals or substitutions of any such agreements for the disposition of such Rights."

f.   It includes an exhibit that identifies the covered works and It provides that other works for which TLA agrees to assume representation "shall be subject to the terms of this agreement and shall be considered a Work hereunder."

g.   It requires Author to offer any additional works created during the term of the Agreement "to TLA for review and possible representation; however, TLA is not obliged to accept any such additional Works for representation. If TLA has not procured any agreement for a particular Additional Work within 60 days after presented by Author, Author shall be free to seek alternative representation for such work."

h.   It states that the "agreement may not be modified nor may any provision be waived except in a writing signed by both parties."

**ANSWER:** Plaintiff objects to this statement as compound in nature. Notwithstanding that objection, Plaintiff admits that the Agency Agreement includes these relevant provisions and notes there is an exhibit and notes that the provision described in 5(a) includes "the exception of artwork on paper to be presented in a gallery or self-published on the Wild Unknown website and not for commercial retail distribution or sale." ECF No. 6-1.

**TLA'S REPLY:** Paragraph 5 is undisputed in all material respects. Although Plaintiff's additional response and quotation from the Agency Agreement is undisputed, it is immaterial.

### *Publishing Deals Negotiated and Titles Sold by TLA for Plaintiff*

6.      Over the course of the representation, TLA secured and negotiated eight primary publishing contracts with four major publishers. Decl. of Mona Houck ("Houck Decl."), Ex. A-F.

**ANSWER:** Plaintiff objects to this statement on the grounds that it is not supported by the cited evidence. Defendant's evidence only demonstrates contracts with three publishers: (1) Random House Children's Books (Ex. A); (2) HarperCollins Publishers, LLC (Ex. B, C, D, E); (3) Chronicle Books, LLC (Ex. F).

**TLA'S REPLY:** Paragraph 6 is undisputed in all material respects. The included evidence plainly shows eight publishing contracts with *four* major publishers, and the citation should have referred to Exhibits A-H. The fourth publisher is Hachette, ECF No. 27-8, which Plaintiff acknowledges in ¶ 52 below. It is a waste of the Court's and counsels' time to object based on nothing more than typos.

7.      These publishing contracts have so far led to publication of 16 of Plaintiff's works, earning Plaintiff millions of dollars. Thompson Decl. ¶ 6.

**ANSWER:** This statement is not disputed for purposes of summary judgment.

8.      TLA's success was immediate: TLA negotiated and secured a three-book

publishing deal with **Random House**, finalized in March 2015, for three children's books: *ABC*

*Dream, 123 Dream,* and *Whose Moon Is That?* Houck Decl. Ex. A.

> **ANSWER:** Admitted as to the fact that TLA negotiated a three-book publishing deal
>
> with Random House in March 2015 for the aforementioned books.

9.      The publishing agreement outlines the royalties due to Plaintiff, which she

receives in perpetuity, as long as the books are sold, for the life of the copyright. *Id.*

> **ANSWER:** This statement is not disputed for purposes of summary judgment.
>
> Answering further, Plaintiff denies that any publishing agreement, is at issue in this
>
> litigation.
>
> **TLA'S REPLY:** Paragraph 9 is undisputed in all material respects. As Plaintiff noted in
>
> her response to ¶ 4 above, every publishing contract included in Exhibits A-H, ECF Nos.
>
> 27-1–8, is relevant to this lawsuit. This contract is one of those agreements. Further,
>
> Plaintiff's denial is a conclusion of law, not a statement of fact based on admissible
>
> evidence, and is therefore an inappropriate response.

10.     The publishing agreement for these books also states in its agency clause the

commission on those royalties due to TLA, which it is to receive as long as the works are sold.

The agreement "irrevocably appoints Thompson Literary Agency, LLC as the Author's sole and

exclusive agent … with respect to the Work for the life of copyright" and "irrevocably assigned"

to TLA "15% of all monies paid to the Author hereunder." *Id.*

**ANSWER:** Plaintiff admits that the agency clause states that Plaintiff irrevocably appoints TLA as Plaintiff's sole and exclusive agent. However, Plaintiff denies Defendant's characterization of the commission sentence, of which Defendant omits portions. The commission sentence in its entirety, reads: "***In consideration for services rendered***, the Agent is entitled to receive or retain as its commission (and is hereby irrevocably assigned) 15% of all monies paid to Author hereunder." Houck Decl. Ex. A at ¶ 23 (emphasis supplied).

**TLA'S REPLY:** Paragraph 10 is undisputed in all material respects. Plaintiff's additional quotation from the agreement is undisputed.

11.     Next, TLA conducted extensive negotiations with **HarperCollins** in 2015 for Plaintiff's first tarot card publishing deal for *The Wild Unknown Tarot Deck and Guidebook*. Houck Decl. Ex. B.

**ANSWER:** Plaintiff admits that TLA engaged in negotiations with HarperCollins regarding *The Wild Unknown Tarot Deck and Guidebook*, but denies that any publishing agreement is at issue in this litigation.

**TLA's REPLY:** Paragraph 11 is undisputed in all material respects. As to the additional response, see TLA's reply to ¶ 9.

12.     When TLA completed negotiations and finalized the deal in February 2016, HarperCollins had increased its initial advance by 150 percent, added a bonus, and improved the royalty rate. Thompson Decl. ¶ 9.

**ANSWER:** This statement is not disputed for purposes of summary judgment.

Answering further, Plaintiff denies that the publishing agreement for The Wild Unknown

Tarot Deck and Guidebook but denies that this agreement, or any other publishing

agreement, is at issue in this litigation.

**TLA's REPLY:** Paragraph 12 is undisputed in all material respects. As to the additional

response, see TLA's reply to ¶ 9.


13.     The publishing agreement for *The Wild Unknown Tarot Deck and Guidebook*
assigns to the publisher all rights except those specifically reserved to the author. The rights
assigned to the publisher include publication of all physical and digital versions of the work.
Houck Decl. Ex. B.

**ANSWER:** This statement is not disputed for purposes of summary judgment.

Answering further, Plaintiff denies that the publishing agreement for *The Wild Unknown

Tarot Deck and Guidebook*, or any other publishing agreement, is at issue in this

litigation.

**TLA's REPLY:** Paragraph 13 is undisputed in all material respects. As to the additional

response, see TLA's reply to ¶ 9.


14.     The publishing agreement reserves for Plaintiff worldwide motion picture,
television, merchandising, multimedia adaptation and radio dramatic adaptation rights. *Id.*

**ANSWER:** Admitted in part. The publishing agreement also reserves for Plaintiff

worldwide live-stage dramatic adaption rights and commercial tie-in and merchandising

rights. Houck Decl. Ex. B at Part 1, p. 2. Answering further, Plaintiff denies that the

publishing agreement for *The Wild Unknown Tarot Deck and Guidebook*, or any other publishing agreement, is at issue in this litigation.

**TLA's REPLY:** Paragraph 14 is undisputed in all material respects. As to the additional response, see TLA's reply to ¶ 9.

15.    The publishing agreement provides that "Publisher and Author shall mutually agree upon the cover/jacket design, package/box design and interior design" of the physical versions of the work. *Id.*

ANSWER: This statement is not disputed for purposes of summary judgment. Answering further, Plaintiff denies that the publishing agreement for *The Wild Unknown Tarot Deck and Guidebook*, or any other publishing agreement, is at issue in this litigation.

**TLA's REPLY:** Paragraph 15 is undisputed in all material respects. As to the additional response, see TLA's reply to ¶ 9.

16.    The publishing agreement provides that "Copyright in the Harper Material will belong to Publisher" and that "Author may not reproduce or use the Harper Material without Publisher's written consent." In the agreement, "Harper Material" is defined as "materials created by or for Publisher for use in, or in connection with the publication, or advertising and promotion of, Physical and Digital Versions (but not including materials created by Author or by third parties commissioned and compensated by Author), and includes jacket, cover and interior art and photographs, cover design, cover copy" among other things. *Id.*

**ANSWER:** This statement is not disputed for purposes of summary judgment. Answering further, Plaintiff denies that the publishing agreement for *The Wild Unknown Tarot Deck and Guidebook*, or any other publishing agreement, is at issue in this litigation. .

**TLA's REPLY:** Paragraph 16 is undisputed in all material respects. As to the additional response, see TLA's reply to ¶ 9.


17.     The publishing agreement for *The Wild Unknown* outlines the royalties due to Plaintiff, which she receives as long as the works are sold, for the life of the copyright. *Id.*

**ANSWER:** This statement is not disputed for purposes of summary judgment. Answering further, Plaintiff denies that the publishing agreement for The Wild Unknown Tarot Deck and Guidebook, or any other publishing agreement, is at issue in this litigation.

**TLA's REPLY:** Paragraph 17 is undisputed in all material respects. As to the additional response, see TLA's reply to ¶ 9.


18.     The publishing agreement for *The Wild Unknown* also states in its agency clause the commission on those royalties due to TLA, which it receives as long as the work is sold. The agreement "irrevocably appoints Thompson Literary Agency … as Author's sole and exclusive agent with respect to the Work for the life of copyright" and "irrevocably assigned" to TLA "fifteen percent (15%) of all monies paid to Author hereunder." *Id.*

**ANSWER:** Plaintiff admits that Defendant accurately quotes that the agreement "irrevocably appoints Thompson Literary Agency … as Author's sole and exclusive

agent with respect to the Work for the life of copyright[.]" However, Plaintiff denies

Defendant's characterization of the commission sentence, of which Defendant omits

portions. The commission sentence in its entirety, reads: "***In consideration for services***

***rendered***, Agent is entitled to receive or retain as its commission (and is hereby

irrevocably assigned) fifteen percent (15% of all monies paid to author hereunder." Id. at

Part 2, Sec. 4(j), p. 12 (emphasis supplied). Answering further, Plaintiff denies that the

publishing agreement for *The Wild Unknown Tarot Deck and Guidebook*, or any other

publishing agreement, is at issue in this litigation.

**TLA'S REPLY:** Paragraph 18 is undisputed in all material respects. As to the additional

response, see TLA's reply to ¶ 9.

19.     In addition, the publishing agreement lays out the publisher's control of publicity

and Plaintiff's obligations to participate in promotion of the work, "as deemed necessary by

Publisher." *Id.*

**ANSWER:** Plaintiff denies that Defendant's statement accurately lay's out the

publisher's control of publicity and Plaintiff's obligation to participate in promotion of

the work. The relevant provision in its entirety, reads: "Author shall be available for

multi-city tours, any and all appearances, including print, radio, TV and online promotion

as deemed necessary by Publisher during the one month period immediately following

Publisher's initial publication of the Work" Id. at p. 2. Answering further, Plaintiff denies

that the publishing agreement for *The Wild Unknown Tarot Deck and Guidebook*, or any

other publishing agreement, is at issue in this litigation.

**TLA'S REPLY:** Paragraph 19 is undisputed in all material respects. The content of the agreement speaks for itself, and Plaintiff's additional quotation from the agreement is undisputed. As to Plaintiff's denial, see TLA's reply to ¶ 9.

20.     TLA then negotiated a deal with **HarperCollins** for a second tarot card deck, *The Wild Unknown Animal Spirit Deck and Guidebook*. That contract was executed in June 2017. Houck Decl. Ex. C.

> **ANSWER:** Plaintiff admits that TLA engaged in negotiations with HarperCollins regarding *The Wild Unknown Animal Spirit Deck and Guidebook*, but denies that any publishing agreement is at issue in this litigation.

> **TLA's REPLY:** Paragraph 20 is undisputed in all material respects. As to the additional response, see TLA's reply to ¶ 9.

21.     The publishing agreement for *Animal Spirit* assigns to the publisher all rights except those specifically reserved to the author. The rights assigned to the publisher include publication of all physical and digital versions of the work. *Id.*

> **ANSWER:** This statement is not disputed for purposes of summary judgment. Answering further, Plaintiff denies that the publishing agreement for *The Wild Unknown Animal Spirit Deck and Guidebook*, or any other publishing agreement, is at issue in this litigation.

> **TLA's REPLY:** Paragraph 21 is undisputed in all material respects. As to the additional response, see TLA's reply to ¶ 9.

22.     The publishing agreement reserves for Plaintiff worldwide motion picture, television, merchandising, multimedia adaptation and radio dramatic adaptation rights. *Id.*

**ANSWER:** Admitted in part. Plaintiff admits that the publishing agreement reserves the aforementioned rights, as well as live-stage dramatic adaptation and commercial tie-in rights. *Id.* at Part 1, p. 2. Answering further, Plaintiff denies that the publishing agreement for *The Wild Unknown Animal Spirit Deck and Guidebook*, or any other publishing agreement, is at issue in this litigation.

**TLA'S REPLY:** Paragraph 22 is undisputed in all material respects. The content of the agreement speaks for itself, and Plaintiff's additional reference to it is undisputed. As to the additional response, see TLA's reply to ¶ 9.


23.     The publishing agreement provides that "Publisher and Author shall mutually agree upon the cover/jacket design, package/box design and interior design" of the physical versions of the work. *Id.*

**ANSWER:** This statement is not disputed for purposes of summary judgment. Answering further, Plaintiff denies that the publishing agreement for *The Wild Unknown Animal Spirit Deck and Guidebook*, or any other publishing agreement, is at issue in this litigation.

**TLA's REPLY:** Paragraph 23 is undisputed in all material respects. As to the additional response, see TLA's reply to ¶ 9.


24.     The publishing agreement provides that "Copyright in the Harper Material will belong to Publisher" and that "Author may not reproduce or use the Harper Material without

Publisher's written consent." In the agreement, "Harper Material" is defined as "materials created by or for Publisher for use in, or in connection with the publication, or advertising and promotion of, Physical and Digital Versions (but not including materials created by Author or by third parties commissioned and compensated by Author), and includes jacket, cover and interior art and photographs, cover design, cover copy" among other things. *Id.*

> **ANSWER:** This statement is not disputed for purposes of summary judgment.
>
> Answering further, Plaintiff denies that the publishing agreement for *The Wild Unknown Animal Spirit Deck and Guidebook*, or any other publishing agreement, is at issue in this litigation.
>
> **TLA's REPLY:** Paragraph 24 is undisputed in all material respects. As to the additional response, see TLA's reply to ¶ 9.

25.     The publishing agreement for *Animal Spirit* outlines the royalties due to Plaintiff, which she receives as long as the works are sold, for the life of the copyright. *Id.*

> **ANSWER:** This statement is not disputed for purposes of summary judgment.
>
> Answering further, Plaintiff denies that the publishing agreement for *The Wild Unknown Animal Spirit Deck and Guidebook*, or any other publishing agreement, is at issue in this litigation.
>
> **TLA's REPLY:** Paragraph 24 is undisputed in all material respects. As to the additional response, see TLA's reply to ¶ 9.

26.     The publishing agreement for *Animal Spirit* also states in its agency clause the commission on those royalties due to TLA, which it receives as long as the work is sold. The

agreement "irrevocably appoints Thompson Literary Agency … as Author's sole and exclusive

agent with respect to the Work for the life of copyright" and "irrevocably assigned" to TLA

"fifteen percent (15%) of all monies paid to Author hereunder." *Id.*

> **ANSWER:** Admitted in part and denied in part. Plaintiff admits that Defendant
>
> accurately quotes that the agreement "irrevocably appoints Thompson Literary Agency
>
> … as Author's sole and exclusive agent with respect to the Work for the life of
>
> copyright[.]" However, Plaintiff denies Defendant's characterization of the commission
>
> sentence, of which Defendant omits portions. The commission sentence in its entirety,
>
> reads: "***In consideration for services rendered***, Agent is entitled to receive or retain as its
>
> commission (and is hereby irrevocably assigned) fifteen percent (15%) of all monies paid
>
> to author hereunder." *Id*. at pg. 11, Part 2, Sec. 4(j) (emphasis supplied). Answering
>
> further, Plaintiff denies that the publishing agreement for *The Wild Unknown Animal*
>
> *Spirit Deck and Guidebook*, or any other publishing agreement, is at issue in this
>
> litigation.
>
> **TLA'S REPLY:** Paragraph 26 is undisputed in all material respects. The contract speaks
>
> for itself, and Plaintiff's additional quotation from the agreement is undisputed. As to
>
> Plaintiff's denial, see TLA's reply to ¶ 9.

27.     In addition, the publishing agreement lays out the publisher's control of publicity

and Plaintiff's obligations to participate in promotion of the work, "as deemed necessary by

Publisher." *Id.*

> **ANSWER:** Plaintiff denies that Defendant's statement accurately lay's out the
>
> publisher's control of publicity and Plaintiff's obligation to participate in promotion of

the work. The relevant provision in its entirety, reads: "Author shall be available for multi-city tours, any and all appearances, including print, radio, TV and online promotion as deemed necessary by Publisher during the one month period immediately following Publisher's initial publication of the Work" *Id.* at p. 2. Answering further, Plaintiff denies that the publishing agreement for *The Wild Unknown Animal Spirit Deck and Guidebook*, or any other publishing agreement, is at issue in this litigation.

**TLA'S REPLY:** Paragraph 19 is undisputed in all material respects. The content of the agreement speaks for itself, and Plaintiff's additional quotation is undisputed. As to Plaintiff's denial, see TLA's reply to ¶ 9.

28.     TLA's next negotiation for Plaintiff was for a third tarot deck with **HarperCollins**, *The Wild Unknown Archetypes Deck,* along with *The Wild Unknown Journal*. TLA finalized the deal in March 2018. Houck Decl. Ex. D

**ANSWER:** Plaintiff admits that TLA engaged in negotiations with HarperCollins regarding *The Wild Unknown Archetypes Deck* and *The Wild Unknown Journal*, but denies that any publishing agreement is at issue in this litigation.

**TLA's REPLY:** Paragraph 28 is undisputed in all material respects. As to the additional response, see TLA's reply to ¶ 9.

29.     The publishing agreement for *The Wild Unknown Archetypes Deck* and *The Wild Unknown Journal* assigns to the publisher all rights except those specifically reserved to the author. The rights assigned to the publisher include publication of all physical and digital versions of the work. *Id.*

**ANSWER:** This statement is not disputed for purposes of summary judgment. Answering further, Plaintiff denies that the publishing agreements for *The Wild Unknown Archetypes Deck* and *The Wild Unknown Journal*, or any other publishing agreement, is at issue in this litigation.

**TLA's REPLY:** Paragraph 29 is undisputed in all material respects. As to the additional response, see TLA's reply to ¶ 9.

30.     The publishing agreement reserves for Plaintiff worldwide motion picture, television, merchandising, multimedia adaptation and radio dramatic adaptation rights. *Id.*

**ANSWER:** Admitted in part. The publishing agreement also reserves for Plaintiff worldwide live-stage dramatic adaption rights and commercial tie-in and merchandising rights. *Id.* at Part 1, p. 2. Answering further, Plaintiff denies that the publishing agreements for *The Wild Unknown Archetypes Deck* and *The Wild Unknown Journal*, or any other publishing agreement, is at issue in this litigation.

**TLA'S REPLY:** Paragraph 30 is undisputed in all material respects. The content of the agreement speaks for itself, and Plaintiff's additional reference to it is undisputed. As to Plaintiff's denial, see TLA's reply to ¶ 9.

31.     The publishing agreement provides that "Publisher and Author shall mutually agree upon the cover/jacket design, package/box design and interior design" of the physical versions of the work. *Id.*

**ANSWER:** This statement is not disputed for purposes of summary judgment. Answering further, Plaintiff denies that the publishing agreements for *The Wild Unknown*

*Archetypes Deck and The Wild Unknown Journal*, or any other publishing agreement, is

at issue in this litigation.

**TLA's REPLY:** Paragraph 31 is undisputed in all material respects. As to the additional

response, see TLA's reply to ¶ 9.

32.     The publishing agreement provides that "Copyright in the Harper Material will

belong to Publisher" and that "Author may not reproduce or use the Harper Material without

Publisher's written consent." *Id.* In the agreement, "Harper Material" is defined as "materials

created by or for Publisher for use in, or in connection with the publication, or advertising and

promotion of, Physical and Digital Versions (but not including materials created by Author or by

third parties commissioned and compensated by Author), and includes jacket, cover and interior

art and photographs, cover design, cover copy" among other things. *Id.*

ANSWER: This statement is not disputed for purposes of summary judgment.

Answering further, Plaintiff denies that the publishing agreements for *The Wild Unknown*

*Archetypes Deck* and *The Wild Unknown Journal*, or any other publishing agreement, is

at issue in this litigation.

**TLA's REPLY:** Paragraph 32 is undisputed in all material respects. As to the additional

response, see TLA's reply to ¶ 9.

33.     The publishing agreement for *The Wild Unknown Archetypes Deck* and *The Wild*

*Unknown Journal* outlines the royalties due to Plaintiff, which she receives as long as the work is

sold, for the life of the copyright. *Id.*

**TLA's REPLY:** Paragraph 33 is undisputed. (Note that Plaintiff did not reply to Paragraph 33, but copied and replied to Paragraph 34 twice.)

34.     The publishing agreement for *The Wild Unknown Archetypes Deck* and *The Wild Unknown Journal* also states in its agency clause the commission on those royalties due to TLA, which it receives as long as the work is sold. The agreement "irrevocably appoints Thompson Literary Agency … as Author's sole and exclusive agent with respect to the Work for the life of copyright" and "irrevocably assigned" to TLA "fifteen percent (15%) of all monies paid to Author hereunder." *Id.*

> **ANSWER**: Admitted in part and denied in part. Plaintiff admits that Defendant accurately quotes that the agreement "irrevocably appoints Thompson Literary Agency … as Author's sole and exclusive agent with respect to the Work for the life of copyright[.]" However, Plaintiff denies Defendant's characterization of the commission sentence, of which Defendant omits portions. The commission sentence in its entirety, reads: "***In consideration for services rendered***, Agent is entitled to receive or retain as its commission (and is hereby irrevocably assigned) fifteen percent (15%) of all monies paid to Author hereunder." *Id*. at Part 2, Sec. 4(j), p. 11 (emphasis supplied). Answering further, Plaintiff denies that the publishing agreements for *The Wild Unknown Archetypes Deck* and *The Wild Unknown Journal*, or any other publishing agreement, is at issue in this litigation.
>
> **TLA'S REPLY:** Paragraph 34 is undisputed in all material respects. The contract speaks for itself, and Plaintiff's additional quotation from the agreement is undisputed. As to Plaintiff's denial, see TLA's reply to ¶ 9.

35.     In addition, the publishing agreement lays out the publisher's control of publicity and Plaintiff's obligations to participate in promotion of the work, "as deemed necessary by Publisher." *Id.*

**ANSWER**: Plaintiff denies that Defendant's statement accurately lay's out the publisher's control of publicity and Plaintiff's obligation to participate in promotion of the work. The relevant provision in its entirety, reads: "Author shall be available for multi-city tours, any and all appearances, including print, radio, TV and online promotion as deemed necessary by Publisher during the one month period immediately following Publisher's initial publication of the Work" *Id*. at p. 2. Answering further, Plaintiff denies that the publishing agreements for *The Wild Unknown Archetypes Deck* and *The Wild Unknown Journal*, or any other publishing agreement, is at issue in this litigation.

**TLA'S REPLY:** Paragraph 35 is undisputed in all material respects. The content of the agreement speaks for itself, and Plaintiff's additional quotation is undisputed. As to Plaintiff's denial, see TLA's reply to ¶ 9.


36.     In TLA's next negotiation on behalf of Plaintiff, the agency sold two book projects to **HarperCollins**, titled *Blossoms and Bones* and *My So-Called Past Lives,* in a deal that was finalized in June 2019. Houck Decl. Ex. E.

**ANSWER:** Plaintiff admits that TLA engaged in negotiations with HarperCollins regarding *Blossoms and Bones* and *My So-Called Past Lives*, but denies that any publishing agreement is at issue in this litigation.

**TLA's REPLY:** Paragraph 36 is undisputed in all material respects. As to the additional response, see TLA's reply to ¶ 9.

37.     The publishing agreement for these books assigns to the publisher all rights except those specifically reserved to the author. The rights assigned to the publisher include publication of all physical and digital versions of the work. *Id.*

   **ANSWER:** This statement is not disputed for purposes of summary judgment. Answering further, Plaintiff denies that the publishing agreements for *Blossoms and Bones* and *My So-Called Past Lives*, or any other publishing agreement, is at issue in this litigation.

   **TLA's REPLY:** Paragraph 37 is undisputed in all material respects. As to the additional response, see TLA's reply to ¶ 9.

38.     The publishing agreement reserves for Plaintiff motion picture, television, radio and live-stage dramatic adaptation, commercial tie-in and merchandising, multimedia adaptation rights. *Id*.

   **ANSWER:** This statement is not disputed for purposes of summary judgment. Answering further, Plaintiff denies that the publishing agreements for *Blossoms and Bones* and *My So-Called Past Lives*, or any other publishing agreement, is at issue in this litigation.

   **TLA's REPLY:** Paragraph 38 is undisputed in all material respects. As to the additional response, see TLA's reply to ¶ 9.

39.     The publishing agreement for these book projects outlines the royalties due to Plaintiff, which she receives as long as the work is sold, for the life of the copyright. *Id.*

**ANSWER:** This statement is not disputed for purposes of summary judgment. Answering further, Plaintiff denies that the publishing agreements for *Blossoms and Bones* and *My So-Called Past Lives*, or any other publishing agreement, is at issue in this litigation.

**TLA's REPLY:** Paragraph 39 is undisputed in all material respects. As to the additional response, see TLA's reply to ¶ 9.

40.     The publishing agreement for these books also states in its agency clause the commission on those royalties due to TLA, which it receives as long as the works are sold. The publishing agreement for the book projects further "irrevocably appoints Thompson Literary Agency … as Author's sole and exclusive agent with respect to the Work for the life of copyright" and "irrevocably assigned" to TLA "fifteen percent (15%) of all monies paid to Author hereunder." *Id.*

**ANSWER:** Admitted in part and denied in part. Plaintiff admits that Defendant accurately quotes that the agreement "irrevocably appoints Thompson Literary Agency … as Author's sole and exclusive agent with respect to the Work for the life of copyright[.]" However, Plaintiff denies Defendant's characterization of the commission sentence, of which Defendant omits portions. The commission sentence in its entirety, reads: "***In consideration for services rendered***, Agent is entitled to receive or retain as its commission (and is hereby irrevocably assigned) fifteen percent (15%) of all monies paid to Author hereunder." *Id*. at Part 2, Sec. 4(j), p. 11 (emphasis supplied). Answering

further, Plaintiff denies that the publishing agreements for *Blossoms and Bones* and *My So-Called Past Lives*, or any other publishing agreement, is at issue in this litigation.

**TLA'S REPLY:** Paragraph 40 is undisputed in all material respects. The contract speaks for itself, and Plaintiff's additional quotation from the agreement is undisputed. As to Plaintiff's denial, see TLA's reply to ¶ 9.


41.     In addition, the publishing agreement lays out the publisher's control of publicity and Plaintiff's obligations to participate in promotion of the work, "as deemed necessary by Publisher." *Id.*

**ANSWER:** Plaintiff denies that Defendant's statement accurately lay's out the publisher's control of publicity and Plaintiff's obligation to participate in promotion of the work. The relevant provision in its entirety, reads: "Author shall be available for multi-city tours, any and all appearances, including print, radio, TV and online promotion as deemed necessary by Publisher during the one month period immediately following Publisher's initial publication of the Work" *Id*. at p. 2. Answering further, Plaintiff denies that the publishing agreements for *Blossoms and Bones* and *My So-Called Past Lives*, or any other publishing agreement, is at issue in this litigation.

**TLA'S REPLY:** Paragraph 41 is undisputed in all material respects. The content of the agreement speaks for itself, and Plaintiff's additional quotation is undisputed. As to Plaintiff's denial, see TLA's reply to ¶ 9.

42.     TLA then sought a new primary publishing partner for Plaintiff and negotiated a deal with **Chronicle** for *The Wild Unknown Alchemy Deck* and other products, including a journal, notebook, and notecards. TLA finalized the deal in September 2020. Houck Decl. Ex. F.

**ANSWER:** Plaintiff admits that TLA engaged in negotiations with Chronicle regarding *The Wild Unknown Alchemy Deck*, but denies that any publishing agreement is at issue in this litigation.

**TLA's REPLY:** Paragraph 42 is undisputed in all material respects. As to the additional response, see TLA's reply to ¶ 9.


43.     The publishing agreement for *The Wild Unknown Alchemy Deck* assigns to the publisher all rights except those specifically reserved to the author. The rights assigned to the publisher include publication of all physical and digital versions of the work. *Id.*

**ANSWER:** This statement is not disputed for purposes of summary judgment. Answering further, Plaintiff denies that the publishing agreement for *The Wild Unknown Alchemy Deck*, or any other publishing agreement, is at issue in this litigation.

**TLA's REPLY:** Paragraph 43 is undisputed in all material respects. As to the additional response, see TLA's reply to ¶ 9.


44.     The publishing agreement reserves for Plaintiff ancillary products for the main deck, merchandising and performance rights. *Id.*

**ANSWER:** This statement is not disputed for purposes of summary judgment. Answering further, Plaintiff denies that the publishing agreement for *The Wild Unknown Alchemy Deck*, or any other publishing agreement, is at issue in this litigation.

**TLA's REPLY:** Paragraph 44 is undisputed in all material respects. As to the additional response, see TLA's reply to ¶ 9.

45.     The publishing agreement for *The Wild Unknown Alchemy Deck* outlines the royalties due to Plaintiff, which she receives as long as the work is sold, for the life of the copyright. *Id.*

   **ANSWER:** This statement is not disputed for purposes of summary judgment. Answering further, Plaintiff denies that the publishing agreement for *The Wild Unknown Alchemy Deck*, or any other publishing agreement, is at issue in this litigation.

   **TLA's REPLY:** Paragraph 45 is undisputed in all material respects. As to the additional response, see TLA's reply to ¶ 9.

46.     The publishing agreement for *The Wild Unknown Alchemy Deck* also states in its agency clause the commission on those royalties due to TLA, which it receives as long as the work is sold. The agreement "irrevocably appoints Thompson Literary Agency as the Author's sole and exclusive agent with respect to the Work for the life of copyright" and "irrevocably assigned" to TLA "15% of all monies paid to the Author hereunder." *Id.*

   **ANSWER:** Admitted in part and denied in part. Plaintiff admits that Defendant accurately quotes that the agreement "irrevocably appoints Thompson Literary Agency, LLC as the Author's sole and exclusive agent with respect to the Works for the life of copyright[.]" However, Plaintiff denies Defendant's characterization of the commission sentence, of which Defendant omits portions. The commission sentence in its entirety, reads: "***In consideration for services rendered***, the Agent is entitled to receive or retain

as its commission (and is hereby irrevocably assigned) 15% of all monies paid to Author

hereunder." *Id*. at ¶ 26 (emphasis supplied). Answering further, Plaintiff denies that the

publishing agreement for *The Wild Unknown Alchemy Deck*, or any other publishing

agreement, is at issue in this litigation.

**TLA'S REPLY:** Paragraph 46 is undisputed in all material respects. The contract speaks

for itself, and Plaintiff's additional quotation from the agreement is undisputed. As to the

additional response, see TLA's reply to ¶ 9.


47.      In addition, the publishing agreement lays out the publisher's control of publicity,

noting that it has the exclusive right to publish, promote and advertise the work. *Id.*

**ANSWER**: This statement is not disputed for purposes of summary judgment.

Answering further, Plaintiff denies that the publishing agreement for *The Wild Unknown*

*Alchemy Deck*, or any other publishing agreement, is at issue in this litigation.

**TLA's REPLY:** Paragraph 47 is undisputed in all material respects. As to the additional

response, see TLA's reply to ¶ 9.


48.      In 2021, TLA negotiated and secured a deal with **Random House** to publish

Plaintiff's board game called *Renunciation.* This contract was finalized in May 2021. Houck

Decl. Ex. G

**ANSWER**: Plaintiff admits that TLA engaged in negotiations with **Random House**

regarding *Renunciation*, but denies that any publishing agreement is at issue in this

litigation.

**TLA's REPLY:** Paragraph 48 is undisputed in all material respects. As to the additional response, see TLA's reply to ¶ 9.

49.     The publishing agreement for *Renunciation* outlines the royalties due to Plaintiff, which she receives as long as the work is sold, for the life of the copyright. *Id.*

**ANSWER:** This statement is not disputed for purposes of summary judgment. Answering further, Plaintiff denies that the publishing agreement for *Renunciation*, or any other publishing agreement, is at issue in this litigation.

**TLA's REPLY:** Paragraph 49 is undisputed in all material respects. As to the additional response, see TLA's reply to ¶ 9.

50.     The publishing agreement for *Renunciation* also states in its agency clause the commission on those royalties due to TLA, which it receives as long as the work is sold. The agreement "appoint[ed] Thompson Literary Agency as the Author's sole and exclusive agent with respect to the Work for the life of copyright" and "irrevocably assigned" to TLA "15% of all monies paid to the Author hereunder." *Id.*

**ANSWER:** Admitted in part and denied in part. Plaintiff admits that Defendant accurately states that the agency clause includes the commission on royalties due to TLA. However, Plaintiff denies Defendant's characterization of the commission sentence, of which Defendant omits portions. The commission sentence in its entirety, reads: "***In consideration for services rendered***, the Agent is entitled to receive or retain as its commission (and is hereby irrevocably assigned) 15% of all monies paid to Author hereunder." *Id*. at ¶ 23 (emphasis supplied). Answering further, Plaintiff denies that the

publishing agreement for *Renunciation*, or any other publishing agreement, is at issue in this litigation.

**TLA'S REPLY:** Paragraph 50 is undisputed in all material respects. The contract speaks for itself, and Plaintiff's additional quotation from the agreement is undisputed. As to Plaintiff's denial, see TLA's reply to ¶ 9.

51.     In addition, the publishing agreement lays out the publisher's control of publicity and Plaintiff's obligations to participate in promotion of the work, stating that "[a]ll details of the advertising and promotion of the Work shall be determined by Publisher." *Id.*

**ANSWER:** This statement is not disputed for purposes of summary judgment. Answering further, Plaintiff denies that the publishing agreement for *Renunciation*, or any other publishing agreement, is at issue in this litigation

**TLA's REPLY:** Paragraph 51 is undisputed in all material respects. As to the additional response, see TLA's reply to ¶ 9.

52.     In August of 2021, TLA finalized its last deal for Plaintiff, an agreement with the **Running Press** imprint of **Hachette Book1Group** to publish two of Plaintiff's children's books, *Hello Sacred Life* and *Hello Sacred Creatures*. Houck Decl. Ex. H.

**ANSWER:** Plaintiff admits that TLA engaged in negotiations with Hachette Book Group regarding *Hello Sacred Life* and *Hello Sacred Creatures*, but denies that any publishing agreement is at issue in this litigation.

**TLA's REPLY:** Paragraph 52 is undisputed in all material respects. As to the additional response, see TLA's reply to ¶ 9.

53.     The publishing agreement for these children's books outlines the royalties due to Plaintiff, which she receives as long as the work is sold, for the life of the copyright. *Id.*

**ANSWER:** This statement is not disputed for purposes of summary judgment. Answering further, Plaintiff denies that the publishing agreements for *Hello Sacred Life* and *Hello Sacred Creatures*, or any other publishing agreement, is at issue in this litigation.

**TLA's REPLY:** Paragraph 53 is undisputed in all material respects. As to the additional response, see TLA's reply to ¶ 9.

54.     The publishing agreement for these books identifies Thompson Literary Agency as Plaintiff's agent and directs that payments be directed to the agent. *Id.*

**ANSWER:** Admitted in part and denied in part. Plaintiff admits the publishing agreement identifies TLA as Plaintiff's agent and directs payments be direct to TLA. Plaintiff denies Defendant's characterization of the referenced sentence, as Defendant omits portions. The sentence in its entirety, reads: The Author's agent is The Thompson Literary Agency (the "Agent") and unless the Publisher receives written notice from the Author canceling the Agent's authority hereunder, all payments accruing to the Author under this Agreement shall be made to the Agent, and the receipt by the Agent shall constitute a full and valid discharge of the Publisher's obligations for all payments due the Author under this Agreement. *Id.* at ¶ 32. Answering further, Plaintiff denies that the publishing agreements for *Hello Sacred Life* and *Hello Sacred Creatures*, or any other publishing agreement, is at issue in this litigation.

**TLA'S REPLY:** Paragraph 54 is undisputed in all material respects. The contract speaks for itself, and Plaintiff's additional quotation from the agreement is undisputed. As to Plaintiff's denial, see TLA's reply to ¶ 9.

55.     In addition, the publishing agreement grants full rights to market and promote the work to the publisher as well as control over how the work is advertised, publicized or promoted. It further emphasizes Plaintiff's obligations to participate in promotion of the work "as a material inducement to the Publisher" to enter into the agreement. *Id.*

**ANSWER:** This statement is not disputed for purposes of summary judgment. Answering further, Plaintiff denies that the publishing agreements for *Hello Sacred Life* and *Hello Sacred Creatures*, or any other publishing agreement, is at issue in this litigation.

**TLA's REPLY:** Paragraph 53 is undisputed in all material respects. As to the additional response, see TLA's reply to ¶ 9.

56.     All of the contracts and works identified in ¶¶ 6-55 are covered by the 2020 Agency Agreement. ECF No. 6-1.

**ANSWER:** Plaintiff objects to this statement on the grounds that it is not supported by the cited evidence. Plaintiff denies that the contracts identified in ¶¶ 6-55 are covered by the 2020 Agency Agreement.

**TLA's REPLY:** The agreements speak for themselves. Plaintiff's objection and denial do not create a dispute of fact and are immaterial to the Court's consideration of this motion.

**Effect of Plaintiff Selling Rights to All Physical and Digital Editions**

57.      When HarperCollins began working on the pocket tin version of Plaintiff's *Wild Unknown Archetypes Deck,* it did so with no new contract or permission from Plaintiff, stating: "This format is included under the terms of the overall agreement; we have the rights to all book formats." Houck Decl. Ex. Y.¶

> **ANSWER:** This statement is not disputed for purposes of summary judgment. Answering further, Plaintiff denies that the publishing agreements for *The Wild Unknown Archetypes Deck*, or any other publishing agreement, is at issue in this litigation.

> **TLA's REPLY:** Paragraph 57 is undisputed in all material respects. Plaintiff's additional response is immaterial and irrelevant, as the cited evidence is an email from the publisher, not a publishing agreement.


**Plaintiff's Use of Other Authors' Works for Her Package Design**

58.      As required by the publishing agreement, Plaintiff worked with Harper to produce a mutually agreed upon design for the packaging for her first tarot deck published by Harper, *The Wild Unknown.* Houck Decl. Ex. B, I, J.

> **ANSWER:** Admitted in part and denied in part. Plaintiff admits that she worked with Harper to produce the packaging. However, Plaintiff states that it was her unique design that was selected for the packaging. Plaintiff denies that she only worked with Harper as Meg/TLA was also involved in packaging-related decisions. Krans Declaration, ¶¶ 25-28; Kass Decl., Exs. E, F, and J.

> **TLA's REPLY:** Paragraph 58 is undisputed in all material respects. Plaintiff's nonresponsive, argumentative, vague and conclusory statements that go beyond a response do not create an issue of fact.

59.     This work began in 2015, even before the contract was final. On June 3, 2015, Plaintiff sent an email to Harper offering examples of packaging as potential models for *The Wild Unknown* "packaging and specs." She attached four images. Houck Decl. Ex. J.

**ANSWER:** Plaintiff objects to this statement on the grounds that it is not supported by the cited evidence.

**TLA's REPLY:** Plaintiff's general objection does not create an issue of disputed fact. The email is in the record, and its content speaks for itself.

60.     The publisher responded, providing links to two examples of its own and noting that it would get samples of the products she suggested for its design team to work with. *Id.*

**ANSWER:** Plaintiff objects to this statement on the grounds that it is not supported by the cited evidence.

**TLA's REPLY:** Plaintiff's general objection does not create an issue of disputed fact. The email is in the record, and its content speaks for itself.

61.     Later that month, the publisher wrote that they were "building some actual physical prototypes for Kim." Houck Decl. Ex. K. The publisher then created those prototypes and sent a mock up to Plaintiff on July 8, 2015. Houck Decl. Ex. L.

**ANSWER:** This statement is not disputed for purposes of summary judgment.

62.     On August 1, Plaintiff sent an email to TLA to be forwarded to the publisher, outlining comments on publisher's prototype and including photographs of various other packaging to rely on as models. Houck Decl. Ex. J.

**ANSWER:** Plaintiff objects to this statement on the grounds that it is not supported by the cited evidence.

**TLA's REPLY:** Plaintiff's general objection does not create an issue of disputed fact. The email is in the record, and its content speaks for itself.

63.     She attached a number of images, including a photograph of the *Tarot Illuminati* deck by Kim Huggens and Erik Dunne. *Id.*; Thompson Decl. ¶ 40.

**ANSWER:** This statement is not disputed for purposes of summary judgment.

64.     Huggens and Dunne's deck, still available on Amazon, was published in 2013. Houck Decl. Ex. W.

**ANSWER:** This statement is not disputed for purposes of summary judgment.

65.     The publisher responded on August 12, 2015, commenting on Plaintiff's suggestions and emphasizing the specific needs of the publishing and sales team to which the design would have to adhere. Houck Decl. Ex. M.

**ANSWER:** This statement is not disputed for purposes of summary judgment.

66.     The final package decisions included the elements Plaintiff alleges to be original: a magnetic closure, an interior platform to hold the book above the cards, and a lifting ribbon. Houck Decl. Ex. N.

ANSWER: Denied. The elements that Plaintiff claims to be original are described in the Declaration of Kim Krans. Krans Decl., ¶¶ 29-47; Kass Decl., Exs. E, F, and J.

**TLA's REPLY:** Plaintiff's lengthy descriptions of details she claims (without support) to be original do not create an issue of fact relevant to any issue before the court. The exhibits Plaintiff cites in its denial do not establish the facts she asserts. Paragraph 66 is based on Plaintiff's own discovery, and includes all the information Plaintiff provided on this point before filing her response to this motion. Plaintiff had an obligation to provide this information in her discovery responses. She declined to do. Her refusal to take her discovery obligations seriously should not be disregarded. Because Plaintiff failed to disclose information necessary to establish her claims and failed to disclose information in response to discovery requests, the Court should now reject her effort to do an end-run around the rules and submit self-serving, unsupported, speculative, and conclusory information in a declaration. *See* Fed. R. Civ. P. 37(c).

67.     The image of *Tarot Illuminati* that Plaintiff copied and sent to Harper  shows that the previously published work of Huggens and Dunne also included each of these same elements: a magnetic closure, an interior platform to hold the book above the cards, and a ribbon to help lift the products out of the box. Houck Decl. Ex. J.

**ANSWER:** Denied. There are multiple critical differences and Kim's designs were new and unique. Krans Decl., ¶¶ 29-47; Kass Decl., Exs. E, F, and J.

**TLA's REPLY:** Plaintiff's answer is not responsive to Paragraph 67 and does not create an issue of fact. The images in the cited exhibit show exactly the facts stated here. That Plaintiff also claims differences is not responsive, relevant, or material. *See also* TLA's reply to ¶ 66.

**Plaintiff's Termination of the Agency Agreement**

68.     In a video call on November 17, 2022, Plaintiff notified TLA that she was terminating the Agency Agreement. Thompson Decl. ¶ 14.

**ANSWER:** This statement is not disputed for purposes of summary judgment.

69.     On December 12, 2022, Plaintiff's attorney Jeffrey Kass sent a letter serving as "official termination" of the Agency Agreement. Houck Decl. Ex. O.

**ANSWER:** This statement is not disputed for purposes of summary judgment.

70.     The letter stated: "As everyone knows, there are multiple existing streams of income. The expectation is that TLA will still collect revenue on these, take its commission and pay Kim what she is owed." *Id.*

**ANSWER:** This statement is not disputed for purposes of summary judgment.

71.     Despite being an "official termination" of the agency relationship, the letter further stated that Plaintiff expected that TLA would continue to pursue publishing opportunities for ancillary products and international translations and to continue to "engage with Kim and the publisher" on the *Renunciation* board game—the rights to which TLA successfully sold to Random House in 2021—"and see it through to its conclusion." *Id.*

**ANSWER:** This statement is not disputed for purposes of summary judgment.

72.     The letter also stated that "Kim very much values your friendship and prefers an amicable and cooperative path forward" and added that "It cannot be said enough that Kim desires a very cooperative and amicable path forward." *Id.*

**ANSWER:** This statement is not disputed for purposes of summary judgment.

73.     The letter did not allege any shortcomings in TLA's representation; it did not raise any concern about TLA's other tarot clients; it did not allege any issue with any client's packaging. *Id.*

> **ANSWER:** Plaintiff admits that the letter did not allege any shortcomings in TLA's representation, but denies that TLA was unaware of the issues Kim had with TLA, as the issues were raised by Kim several times before termination. Krans Declaration, ¶¶ 22-23, 53.

> **TLA's REPLY:** Paragraph 73 is undisputed in all material respects. Plaintiff's further answer beyond her admission is not responsive to Paragraph 73 and does not create an issue of fact.

74.     In text messages with her business manager, Billy Goldberg, on January 24, 2023, Plaintiff discussed plans to "threaten litigation" against TLA. Plaintiff mentioned only two reasons: that she missed the launch date of the *Animal Spirit Pocket Deck* and that she had not been provided foreign contracts. (She had in fact been provided the contracts, and she has not raised that issue in this case.) Houck Decl. Ex. P.

> **ANSWER:** Denied. Defendant has mischaracterized Plaintiff's statement. Plaintiff was referring to some of the reasons why she would consider pursuing litigation. She was not stating all of the reasons why she was considering pursuing litigation. Krans Declaration, ¶ 62.

**TLA's REPLY:** Paragraph 74 is undisputed in all material respects. Plaintiff's answer is not responsive to Paragraph 74 and does not create an issue of fact. The text of the cited exhibit shows exactly the facts stated here. Plaintiff's conclusory and additional commentary and argument is not responsive, relevant, or material.

**Plaintiff's Knowledge of the Animal Spirit Pocket Deck Launch**

75.     Harper published Plaintiff's *Animal Spirit Pocket Deck* on October 25, 2022. ECF No. 22 ¶ 27.

**ANSWER:** This statement is not disputed for purposes of summary judgment.

76.     Plaintiff alleges in the FAC that she first heard of the publication date on December 8, 2022, and was "extremely surprised to learn that the publication had happened more than a month earlier." *Id.* ¶ 28.

**ANSWER:** This statement is not disputed for purposes of summary judgment.

77.     Plaintiff received an email from her editor at Harper on *October 29, 2021,* stating that for this deck, the "on-sale date is currently slated for 10/25/22." Houck Decl. Ex. Q.

**ANSWER**: Plaintiff admits that she received an email from her editor at Harper, but states that standard practice with Meg and TLA under the Agency Agreement was for Meg and TLA to be actively engaged in Kim's product launches. This included notifying Kim about publication dates, critical deadlines, and anything else necessary in the constantly-changing world of publishing

**TLA's REPLY:** Paragraph 77 is undisputed in all material respects. Plaintiff's further response beyond her admission is argumentative and conclusory and not responsive, relevant, or material. In addition, it is not based on any admissible evidence and should be disregarded.

78.     Plaintiff's assistant, Cara Engh, wrote to the Harper editor on *November 1, 2021*, and received a response that again stated that the "[o]n-sale date is: 10/25/22" for the *Animal Spirit Pocket Deck.* Houck Decl. Ex. R.

   **ANSWER:** This statement is not disputed for purposes of summary judgment.

79.     On *May 6, 2022*, Ms. Engh emailed the editor asking, "Can you send us the pub date again?" And the editor responded: "Our on-sale date is 10/25/2022." Houck Decl. Ex. S.

   **ANSWER:** This statement is not disputed for purposes of summary judgment.

**Plaintiff's Lack of Support for Her Allegations**

80.     In response to Plaintiff's discovery requests, TLA produced 13,150 pages of documents, which included more than four years of its email and text exchanges with Plaintiff, her assistants, her editors and publishers and many others. Houck Decl. ¶ 22.

   **ANSWER:** Plaintiff admits that TLA produced thousands of pages of document in response to Plaintiff's discovery requests.

81.     In response to TLA's requests for documents, Plaintiff produced 92 pages of documents. Houck Decl. ¶ 23.

**ANSWER:** Plaintiff states that she produced every document responsive to TLA's requests that was in her possession, custody, and control.

82.     Asked for documents reflecting communications regarding TLA's representation of Plaintiff, Plaintiff responded: "Objection. This request is grossly overbroad and not limited to any topic or even this lawsuit. It seeks communications that are wholly irrelevant." Houck Decl. Ex. T.

**ANSWER:** Plaintiff admits that it objected to TLA's request on the basis that it was overbroad and not narrowly tailored to uncover evidence relevant to the issues raised in this litigation.

83.     Asked for documents related to any alleged breach, Plaintiff responded: "Objection. This request is grossly overbroad. Responsive documents will be produced. Keep in mind, though, the inaction and omissions are not in documents because TLA wasn't doing things. That is the point. Also, most communications related to this were verbal." *Id.*

**ANSWER:** This statement is not disputed for purposes of summary judgment.

84.     Asked for documents related to one of Plaintiff's primary claims "regarding any copying or imitation of the packaging of any of your works," Plaintiff responded: "These were all verbal communications so no documents." *Id.*

**ANSWER:** Plaintiff disputes the Defendant's insinuation that she did not produce documents to Defendant's discovery requests. See i.e. Kass Decl., Exs. A and B.

**TLA's REPLY:** Paragraph 84 is undisputed in all material respects. This is a direct

quotation from Plaintiff's discovery responses, which are in the record and speak for

themselves.


85.     Asked for documents related to Plaintiff's allegations regarding TLA's

representation of other tarot artists, Plaintiff responded: "These were verbal communications so

no documents." *Id.*

    **ANSWER:** This statement is not disputed for purposes of summary judgment.


86.     Although she has no documents evidencing she had any issue with TLA's

representation of other artists or their products, she wrote a blurb praising the work of another

TLA client whose publisher—HarperCollins—used a magnetic "keepsake box" for her product.

Houck Decl. Ex. U.

    **ANSWER:** Admitted in part and denied in part, Plaintiff admits that she does not have

    documents demonstrating her concerns. However, this selective phrasing is misleading,

    as Plaintiff explained in her responses to Defendant's Requests to Produce that there were

    verbal conversations. Krans Declaration, ¶ 58. Plaintiff further disputes this based on the

    mischaracterization of the blurb. Plaintiff's review praises the work of a hand analyst, not

    the packaging structure itself. Further, the work is in the "palmistry" genre, a genre that

    does not overlap with any of Plaintiff's works. Houck Decl. Ex. U.

    **TLA's REPLY:** Paragraph 86 is undisputed in all material respects. Plaintiff's further

    response beyond her admission is argument that is not responsive, relevant, or material.

87.     Asked to "identify in detail" acts or omissions that constituted a breach Plaintiff made only the claims that, in 2022, TLA:

   a.   "Was unavailable and uninterested in pitching three major projects Krans' produced in 2022."

   b.   "Refused to pitch projects to publishers, saying Krans' (sic) needed to further development (sic) beyond that of any previous pitches"

   c.   "Refused to respond to text, emails, or phone calls directly – making only her assistant respond."

   d.   "Rarely had camera on or engaged during [marketing] meetings"

   e.   "Refused to be on any marketing, editorial, or promotional meetings concerning the release of Renunciation board game (published August 2023)"

   f.   "Refused to support promotion of author's products in any way"

   g.   "Refused to share or promote any of authors announcements on social platforms. Blocked author on social channels and deleted posts, comments, and tags related to author."

Houck Decl. Ex. V.

**ANSWER:** This statement is not disputed for purposes of summary judgment.

88.     At every key point, Plaintiff has had nothing to say about the alleged breaches:

   a.   She did not raise the allegations in the FAC with TLA during the course of the representation. Thompson Decl. ¶¶ 32, 35.

   b.   Neither she nor her lawyer included any provisions to address any of these allegations when they negotiated the 2020 Agency Agreement. ECF No. 6-1.

c. Her lawyer did not include any of these issues in the formal termination letter. Houck Decl. Ex. O.

d. She did not cite these issues in a text to her business manager explaining her reasons for "threatening litigation." Houck Decl. Ex. P.

e. She did not produce a single document showing a time she has raised these issues with TLA, with any editor or publisher, or with any member of her staff. Houck Decl. Ex. T.

**ANSWER:** This is a mischaracterization and conclusory statement that is not supported by the cited evidence. To the extent that an answer is required, this statement is disputed. Krans Decl. ¶ 23.

**TLA's REPLY:** The statements in Paragraph 88 are directly supported by the cited and admissible evidence. Plaintiff's refusal to respond directly fails to create any issue of material fact and should also be deemed an admission.

### DEFENDANT'S RESPONSE TO PLAINTIFF'S STATEMENT
### OF ADDITIONAL MATERIAL FACTS

1.    Kim is an artist and author of tarot card decks, oracle decks, and books on spirituality. Krans Decl., ¶ 1.

**TLA'S RESPONSE:** Undisputed.

2.    In In 2011, Kim self-published her first children's book, ABC Dream, and in 2012 Kim self-published the New York Times bestseller The Wild Unknown Tarot Deck and Guidebook. *Id.*, ¶ 2.

**TLA'S RESPONSE:** Undisputed that Plaintiff self-published works before TLA

negotiated agreements with major publishers on her behalf. Undisputed that *The Wild*

*Unknown Tarot and Guidebook* was a New York Times bestseller. (Although only the

mass market version published by HarperCollins in 2016 was a bestseller, not Plaintiff's

self-published version.)

3.      While The Wild Unknown Tarot had done exceedingly well in the self-publishing

space, a representative of the publishing company HarperCollins contacted Kim on March 25,

2015 interested in acquiring The Wild Unknown Tarot Deck and Guidebook. Id., ¶ 3; Kass Decl.,

Ex. L.

**TLA'S RESPONSE:** Undisputed. (Although the correct date is March 24, 2015.)

4.      Kim then introduced Meg and TLA to Harper Collins as her literary agent and

agency, respectively. Krans Decl., ¶ 4.

**TLA'S RESPONSE:** Undisputed.

5.      From 2014 to 2021, Meg and TLA performed what was understood to be typical

agent/agency services on Kim's behalf. These services included:

a.      Holding regular meetings with Kim about new projects and pitches;

b.      Enthusiastically pitching Kim's new projects to publishers in a timely manner;

c.      Responding promptly and directly to Kim's emails, texts, and phone calls;

d.      Attending virtual marketing meetings (with camera on) for forthcoming product

launches;

e.     Engaging with publishers, PR team, and editors on Kim's behalf to ensure successful product launches and adherence to contractual agreements;

f.     Assisting in the organization, production and marketing of launch events;

g.     Attending launch and promotional events of author both in person and online;

h.     Engaging and sharing all promotional materials on social media platforms related to announcements of product launches.

Id., ¶ 5; Kass Decl., Ex. H.

**TLA'S RESPONSE:** Undisputed for the purposes of this motion, except to the extent the dates conflict with Plaintiff's own pleadings, which allege no change until some point in 2022. ECF No. 22, ¶¶ 27-30. TLA further notes that Plaintiff's characterization of any legal obligations pertaining to "services" is irrelevant and immaterial to this motion, and that it is unclear what "all promotional materials" means in ¶ 5(h).

6.     TLA/Meg and Kim operated pursuant to separate written agreements covering specific works. The last agreement we entered into was dated August 27, 2020 and relates directly to the work The Wild Unknown Tarot (the "Agreement"). Krans Decl., ¶ 6.

**TLA'S RESPONSE:** Undisputed as to the parties' last and operative agreement being the one dated August 27, 2020.

7.     The disputed portion of the Agreement was drafted by TLA. Kim's Attorney Jeffrey Kass only negotiated ancillary rights not at issue in this litigation. Id., ¶ 7.

**TLA'S RESPONSE:** Undisputed only for the purposes of this motion.

8.      The Agreement states that TLA would be due a 15% commission "[f]or services rendered." ECF No. 6-1.

**TLA'S RESPONSE:** Undisputed but incomplete as it omits the operative language of the Agreement. *See* ECF No. 6-1.

9.      Kim understood the "services" referenced to be those explained in paragraph 5, as the services were the norm in her then-five year relationship with Meg and TLA. Krans Decl., ¶ 9.

**TLA'S RESPONSE:** It is immaterial what Plaintiff's purported understanding of the legal obligations were, as the agreement itself controls. *See* ECF No. 6-1.

10.     From the start of the relationship until 2021, Meg and TLA were intimately involved in every step necessary to achieve publication of Kim's works. Id., ¶ 10.

**TLA'S RESPONSE:** Undisputed for the purposes of this motion except to the extent that this vague response provides dates that conflict with Plaintiff's own pleadings, which allege no change until some point in 2022. ECF No. 22, ¶¶ 27-30.

11.     In 2022, however, there was a drastic change; Meg and TLA became noticeably less interested in supporting Kim and her works. *Id.*, ¶ 11.

**TLA'S RESPONSE:** Disputed as unsupported and not based on admissible evidence, but immaterial to the resolution of this motion.

12.     This was exemplified in a number of ways. One of which was the release of Kim's work, The Animal Spirit Pocket Deck and Guidebook. *Id*., ¶ 12.

**TLA'S RESPONSE:** This is a conclusion, not a statement of fact and therefore does not warrant a response. The statement is also vague and unclear.


13.     Normally (i.e., prior to 2022), Meg and TLA would be actively engaged in Kim's product launches. This included notifying Kim about publication dates, critical deadlines, and anything else necessary in the constantly-changing world of publishing. Normally, Meg would be facilitating marketing meetings and monitoring launch strategy so the efforts of the publisher, author, and agency would be aligned for a successful launch. Normally, Meg helped to organize launch events both in person and online. Normally, Meg and TLA acknowledged Kim's pub dates with celebratory posts on social media by attending events. *Id*., ¶ 13; Kass Decl., Ex. I.

**TLA'S RESPONSE:** Undisputed for the purposes of this motion, but vague and unsupported by admissible evidence or the single 2017 email exhibit citation in this paragraph; vague and unsupported contentions do not alter the terms of the agreement.


14.     With the release of The Animal Spirit Pocket Deck and Guidebook, however, Meg never acknowledged or informed Kim of a launch date. She was informed of the launch date by Harper Collins on Tue, Nov 16, 2021 but afterwards did not acknowledge or in any way support the lead up to this launch for the next 11 months. She and her agency apparently forgot about the launch of this product entirely, until Kim asked her about it after the product had a ready launched. Krans Decl., ¶ 14; Kass Decl., Exs. D and C.

**TLA'S RESPONSE:** Undisputed as to the fact that Meg Thompson was brought into the middle of the referenced email chain (Ex. D) in which the publisher had already directly informed Plaintiff of the publication date of the *Animal Spirit Pocket Deck and Guidebook*. Any other alleged fact in this paragraph is immaterial as well as conclusory, compound, not based on the cited evidence, and not based on personal knowledge or otherwise admissible evidence. The exhibits cited are undisputed and state the facts more accurately than the conclusory characterizations in this paragraph.

15.     Launch date changes are very common in the literary industry. Normally, Kim wouldn't check with the publisher for this information. Rather the launch promotion and marketing would be facilitated and communicated by Meg and TLA, and they would continue to work with the entire team to support the launch as a final step in the success of the work for all parties. Krans Decl., ¶ 15.

**TLA'S RESPONSE:** Immaterial, as well as conclusory, compound, rambling, and unsupported by any admissible evidence.

16.     When TLA was informed on November 16, 2021 that they apparently forgot about the launch that occurred on October 15, 2021, they refused to retroactively support The Animal Spirit Pocket Deck and Guidebook on their social media platforms, despite promoting all of Kim's previous works. Meg attempted to dismiss the importance of this work as "ancillary," even though the Haper sales team reported over 23,000 units sold amidst the misstep of Meg and TLA. Meg would not respond to the email thread directly, but instead had her assistant reply, claiming Meg was "incredibly busy". *Id*., ¶ 16; Kass Decl., Exs. G and C.

**TLA'S RESPONSE:**

- Admitted that HarperCollins reported that 23,000 copies of the *Animal Spirit Pocket Deck and* Guidebook had been sold in the email cited as Plaintiff's Ex. G.

- Admitted that a representative of the Defendant in this action, TLA, responded to the email cited as Plaintiff's Ex. C and that the email accurately reported that Meg Thompson was "incredibly busy."

- Disputed as to the publication date of the *Animal Spirit Pocket Deck and Guidebook,* which was October 25, 2022. *See* undisputed facts in TLA's ¶ 75 above. Accordingly, it is unclear what Plaintiff refers to by saying "TLA was informed on November 16, 2021" that it forgot this publication date.

- Otherwise, the cited exhibits do not support the content of the paragraph, which is immaterial to any legal obligation at issue in this case.

17.     The lack of service related to The Animal Spirit Pocket Deck and Guidebook launch was not the only change in 2022. Krans Decl., ¶ 17.

**TLA'S RESPONSE:** No response warranted; conclusion, not a statement of fact supported by any evidence.

18.     Meg and TLA were also unavailable and uninterested in pitching three major projects Kim produced in 2022. They claimed Kim needed to develop the works further, beyond what Meg had ever requested with any of Kim's previous pitches. *Id*., ¶ 18.

**TLA'S RESPONSE:** Immaterial**,** no issue of fact—the Agency Agreement explicitly states that TLA has no obligation to represent Plaintiff with regard to any new works. *See*

ECF No. 6-1. (Although Plaintiff fails to identify—here or elsewhere—what these projects were or provide any support for the claim that TLA refused to pitch them.)

19.     Meg and Kim used to have an open and direct line of communication, but in 2022 she refused and failed to respond to Kim's texts, emails, or phone calls directly. Her assistant would respond instead. *Id*., ¶ 19.

> **TLA'S RESPONSE:** Undisputed that at all times a representative of the defendant in this action responded to Plaintiff's text, emails, and phone calls, and that sometimes that was Meg Thompson's assistant. No issue of fact—irrelevant and immaterial to any issue in this case who specifically responded to any email. (Although the purposefully vague and overreaching phrasing of this paragraph fails to identify any such instances of failing to respond. Further demonstrably false that this was a pattern "in 2022," based on the extensive discovery provided by TLA in this case.)

20.     One of Kim's latest works is the board game Renunciation. In preparation for its August 2023 publication, Meg refused and failed to be on any marketing, editorial, or promotional meetings concerning the release. This led to a lack of accountability and enthusiasm on the behalf of the publisher, as the agent typically assures marketing expectations and schedules are met by the publisher to ensure a successful launch for all. Instead, there was a theme throughout 2022; during virtual marketing meetings for upcoming product launches, Meg rarely engaged or turned her camera on. There were times Kim was unsure whether she was even in the room. *Id*., ¶ 20.

**TLA'S RESPONSE:**

- Undisputed that one of Plaintiff's latest works is the board game *Renunciation.*

- Undisputed that TLA did not participate in marketing, editorial, or promotional meetings for this product in 2023, given that Plaintiff had fired TLA in a video call on November 17, 2022, with official notice from her attorney on December 12, 2022.

- Plaintiff's claims that this "led to the accountability and enthusiasm on behalf of the publisher" are neither relevant, material, nor based on personal knowledge or otherwise admissible evidence.

- No other alleged fact in this compound paragraph is relevant or material to the issues before the Court.


21.     Meg and TLA also failed to share or promote any of Kim's announcements for Renunciation on social media platforms. Eventually, they blocked Kim on social channels and deleted posts, comments, and tags related to Kim's works. *Id.*, ¶ 21.

**TLA'S RESPONSE:** Undisputed but immaterial as these would not be relevant legal obligations of TLA even during the course of its representation of Plaintiff. Further, *Renunciation*'s publication in August 2023 was well after Plaintiff fired TLA in a video call on November 17, 2022 and the official notice of that termination from her attorney on December 12, 2022.


22.     This change in service was concerning, and Kim voiced her issues and concerns with Meg and TLA several times before terminating the Agreement. *Id.*, ¶ 22.

**TLA'S RESPONSE:** Unsupported by admissible evidence; immaterial to the issues before the Court.

23.     The change in service was not the only reason Kim eventually terminated the Agreement with Meg and TLA, however; Meg and TLA were directly helping Kim's competitors in the tarot card and oracle card market, and creating works similar to Kim's that eventually became competitive works and compromised Kim's sales. *Id.*, ¶ 23.

**TLA'S RESPONSE:** Disputed. Conclusory, speculative, and not based on personal knowledge or any other admissible evidence.

24.     Specifically, they were assisting competing authors in copying and imitating Kim's highly successful "keepsake" box set packaging and design. *Id.*, ¶ 24.

**TLA'S RESPONSE:** Disputed. Conclusory, speculative, and not based on or supported by personal knowledge or any other admissible evidence.

**TLA's Involvement in Packaging Decisions**

25.     To develop her packaging and design, Kim worked with the publisher of the work, while Meg oversaw the entire 11-month process. *Id.*, ¶ 25.

**TLA'S RESPONSE:**

Undisputed that Plaintiff worked with the publisher to develop her packaging and design. Disputed that TLA "oversaw" this process, which is conclusory and not based on any admissible evidence. Plaintiff cites no support other than her conclusory and hearsay declaration for this fact.

26.     The process was different with each publisher, but generally followed the following format:

a.      Kim worked with the publisher providing sketches, descriptions, and examples to demonstrate elements that Kim did—or perhaps more importantly—did not want.

b.      The publisher would then create a prototype for review.

c.      Meg, Kim, and the publisher, would then again exchange ideas and collaborate until we had a final version. They received prototypes from the printer of the physical packaging, giving feedback and notes until the final design elements were in place. Meg was cc'd on all of these emails and often received prototypes and sample decks to review. Meg was included in the entire process for the eleven months of research and development with the publisher, until we arrived at the design known as the "keepsake boxset". *Id*., ¶ 26; Kass Decl., Ex. J.

**TLA's RESPONSE:**

- Paragraphs (a) and (b) are undisputed.

- Paragraph (c) is undisputed as to Plaintiff and publisher's interaction, and that TLA (via Meg Thompson) was copied on two of the ten emails in cited chain.

- Paragraph (c) is disputed as to any claim of TLA's collaboration on the design, as the cited evidence demonstrates that TLA did not participate in or comment on any part of the exchange. *See also* TLA's reply to ¶ 66 above.


27.     Meg was typically included on all email correspondence, including the emails sent between Kim and the publisher. Krans Decl., ¶ 27; Kass Decl., Ex. J.

**TLA's RESPONSE:** Undisputed for the purposes of this motion. (Although immaterial to the issues before the Court, Plaintiff's cited evidence demonstrates it is false that TLA

was copied on all email correspondence. The cited exhibit includes 10 emails, only the

first two of which included TLA.)

28.     This treatment wasn't specific to Kim. Meg and TLA also helped Grace Duong

and Sarah Shipman, amongst others, with their packaging. Krans Decl., ¶ 28.

   **TLA's RESPONSE:** Disputed, speculative, conclusory, and not based on personal

   knowledge or any other admissible evidence.

29.     Kim's packaging is unique in a number of ways. *Id*., ¶ 29.

   **TLA's RESPONSE:** This is a general conclusion, not a specific statement of fact, and

   therefore warrants no response. It is, however immaterial—Plaintiff has not stated a

   copyright claim nor has she identified any proprietary interest that she had in the package

   design that her publishing contracts show is controlled by the publisher. *See also* TLA's

   reply to ¶ 66 above.

**Kim's Distinct Packaging**

30.     The Wild Unknown Tarot Deck and Guidebook packaging was designed and

titled as a "keepsake box." This concept was developed by Kim and Harper as a way to offer the

customer base a more luxury experience of the cards, with a higher price point that allowed the

user to interface with the cards and packaging in several ways. The user to had both an inner box

that contained the cards for grab-and-go purposes, as well as a marketing-free outer box to use as

display as an art object. All of the box design was completed with this goal in mind. *Id*., ¶ 30.

**TLA's RESPONSE:** Undisputed for the purposes of this motion. Irrelevant and immaterial to any issue in this motion, as Plaintiff has not stated a copyright claim. *See also* TLA's reply to ¶ 66 above.

31.     On May 17, 2016 Harper suggested by email that they come up with a new title for the work that acknowledges the uniqueness of this packaging, calling it the "keepsake boxset." *Id.*, ¶ 31; Kass Decl., Ex. F.

**TLA's RESPONSE:** Undisputed for the purposes of this motion. Irrelevant and immaterial to any issue in this motion, as Plaintiff has not stated a copyright claim. *See also* TLA's reply to ¶ 66 above.

32.     Kim had not seen this term used in the tarot market before. Krans Decl., ¶ 32.

**TLA's RESPONSE:** Undisputed for the purposes of this motion. *See also* TLA's reply to ¶ 66 above.

33.     Because Kim's box set was meant to be a "keepsake" Kim had to utilize different design elements and marketing approaches. *Id.*, ¶ 33.

**TLA's RESPONSE:** Undisputed for the purposes of this motion, but irrelevant and lacking in concreteness or specificity as to what it is that Plaintiff is claiming here. *See also* TLA's reply to ¶ 66 above.

34.     Typically, the title of a tarot work is printed directly onto the box, as well as any advertisement-focused designs and marketing copy. *Id.*, ¶ 34.

**TLA's RESPONSE:** Undisputed for the purposes of this motion. *See also* TLA's reply to ¶ 66 above.

35.     Because Kim didn't want The Wild Unknown Tarot Deck and Guidebook box set covered in advertisements or designs geared at advertising, she designed a different method called a "belly band." The belly band allowed the marketing necessary for sale to be removed after purchase, leaving them with an art object for display purposes. *Id.*, ¶ 35.

**TLA's RESPONSE:** Undisputed for the purposes of this motion, but irrelevant and lacking in any reasonable concreteness or clarity. *See also* TLA's reply to ¶ 66 above.

36.     This was key to maintaining a high-end quality and "keepsake" feel. *Id.*, ¶ 36.

**TLA's RESPONSE:** Undisputed for the purposes of this motion, but irrelevant, lacking in any concreteness or clarity, and meaninglessly vague. *See also* TLA's reply to ¶ 66 above.

37.     Additionally, because the guide and the deck were packaged together, Kim believed it important to create "grab-and-go" functionality. She did not want the cards to be left uncontained within the packaging, as some products had them. *Id.*, ¶ 37.

**TLA's RESPONSE:** Undisputed for the purposes of this motion but irrelevant, immaterial, and based on meaningless cliches. *See also* TLA's reply to ¶ 66 above.

38.     In order to achieve this functionality, Kim designed an inner box. *Id.*, ¶ 38.

**TLA's RESPONSE:** Undisputed for the purposes of this motion but vague, irrelevant, and immaterial. *See also* TLA's reply to ¶ 66 above.

39.     This addition of the inner box required development of 4 new custom fit templates. The new size and weight from the inner box element (rather than only the cards) meant they had to change the mechanics of the lifting ribbon and the construction of the platform. *Id*., ¶ 39.

 **TLA's RESPONSE:** Undisputed for the purposes of this motion but irrelevant and immaterial. *See also* TLA's reply to ¶ 66 above.

40.     These aren't the only differences, either. The Wild Unknown Tarot Deck and Guidebook box set does not have thumbholes because it utilizes two lifting ribbons (not just one as other decks have) to lift the products while maintaining a sleek design with no holes. *Id*., ¶ 40.

 **TLA's RESPONSE:** Undisputed for the purposes of this motion but irrelevant and immaterial. Further, it is unclear in this and related paragraphs what it is that these "differences" are distinguishing from or what these "differences" could be relevant to. Different from what product? *See also* TLA's reply to ¶ 66 above.

41.     The platform's folding construction is different. This aspect of the deck is also new – as the platform in The Wild Unknown packaging is designed to be removable from the outer box, allowing the customer to use the outer box to store anything, not just the deck. Art and design files were placed on the base of the box in order to encourage the user to remove the platform and use the box to store sacred objects related to their decks. *Id*., ¶ 41.

**TLA's RESPONSE:** Undisputed for the purposes of this motion but irrelevant and immaterial. *See also* TLA's reply to ¶ 66 above.

42.     The outer box is different dimensions, as is the guidebook, which is bigger and heavier. *Id.*, ¶ 42.

**TLA's RESPONSE:** Undisputed for the purposes of this motion but irrelevant and immaterial. *See also* TLA's reply to ¶ 66 above.

43.     The Guidebook is also bound differently; it uses a flexi-bind book with sewn signatures instead of a glued-paperback. *Id.*, ¶ 43; Kass Decl., Ex. J.

**TLA's RESPONSE:** Undisputed for the purposes of this motion but irrelevant and immaterial. *See also* TLA's reply to ¶ 66 above.

44.     Kim spent nearly an entire year developing this design and packaging before it finally hit the market in 2016. Krans Decl., ¶ 44.

**TLA's RESPONSE:** Undisputed for the purposes of this motion but irrelevant and immaterial. *See also* TLA's reply to ¶ 66 above.

45.     The deck was a huge success, hitting the New York Times bestseller list in October, 2016, and apparently, a huge influence; Meg and TLA helped their other authors use Kim's box set design and template to generate multiple competitive works. *Id.*, ¶ 45.

**TLA's RESPONSE:**

- Undisputed that the deck was successful. (Although the date Plaintiff cites is incorrect, it is immaterial. The deck was not published until November 2016; it appeared on the New York Times bestseller list on December 7, 2016.)

- Disputed that Defendant had any role in designing any competitive work. Plaintiff's assertion is speculative, conclusory, and not based on personal knowledge or any other admissible evidence.

46.     Kim first realized Meg had started to publish other Tarot authors in 2018 when she began promoting Grace Duong's tarot deck called Mystic Mondays Tarot on Instagram. Grace's work became an immediate competitive work, affecting sales in both specialty and mass market as reflected in the sales reports for 2019. *Id.*, ¶ 46.

**TLA'S RESPONSE:**

- Undisputed that TLA represented other tarot authors, including Grace Duong.

- Plaintiff's assertion that this particular work affected her sales is speculative, conclusory, and not based on personal knowledge or any other admissible evidence.

47.     Meg stated on several occasions to Kim in person that all the publishers "wanted what [Kim] had" with the success of The Wild Unknown Tarot Deck and Guidebook Keepsake Boxset. She also said on several occasions fellow authors and publishers were "chasing" what Kim created. *Id.,* ¶ 47.

**TLA'S RESPONSE:** Undisputed for the purposes of this motion, but immaterial and irrelevant.

**Meg's Creation of Competition**

48.    Notably, Kim did not hire Meg and TLA because they were well-known in the tarot card industry. In fact, Meg had no authors previous to Kim that worked in the tarot or new age space. She sold mostly memoirs and cookbooks. *Id.,* ¶ 48.

**TLA'S RESPONSE:** Undisputed that TLA had not previously represented tarot authors. Plaintiff's characterization of TLA's clients is inaccurate but immaterial.

49.    However, after The Wild Unknown Tarot Deck achieved great success in the market, Meg and TLA began representing more tarot authors and artist in the tarot and spirituality markets. *Id.,* ¶ 49.

**TLA'S RESPONSE:** Undisputed for the purposes of this motion.

50.    In conversation, Meg told Kim that other authors, agents, and publishers would bring up Kim's name as a model for success in the market during their sales conversations with Meg. *Id.,* ¶ 50.

**TLA'S RESPONSE:** Undisputed for the purposes of this motion, but irrelevant and immaterial.

51.     Meg and TLA were not merely representing other authors in the industry, however. Meg and TLA were devoting extensive time and attention to these competing authors, to the point it affected their representation of Kim. *Id.,* ¶ 51.

> **TLA'S RESPONSE:** Disputed. Argumentative, speculative, conclusory, and not based on personal knowledge or any other admissible evidence. Agents represent many authors—some of whom write about the same or related subjects and who can always be said to be "competing."

52.     Even worse, Meg and TLA were intentionally assisting them in copying Kim's design and packaging. *Id.,* ¶ 52.

> **TLA'S RESPONSE:** Disputed. Argumentative, speculative, conclusory, and not based on personal knowledge or any other admissible evidence.

53.     Meg told Kim this herself and even admitted to intentionally creating competition for Kim and compromising her sales by diverting sales to imitation products. On November 11, 2021 at an in-person dinner at Barano in Brooklyn, New York, Meg apologized to Kim for representing other tarot authors and creating competitive works. She said she knew it had impacted Kim's sales and that she promised to not publish any more works in the tarot arena. She said Kim was her best-selling and most important tarot author and that she was "officially done selling decks." *Id.,* ¶ 53.

> **TLA'S RESPONSE:** Disputed. Speculative, conclusory, and not based on personal knowledge or any other admissible evidence. Also irrelevant as agents are not barred from representing authors who may write in the same genres or on same subjects.

54.     Not only was this an omission to her own deception as an agent, but it was also a lie. She continued to publish more tarot and oracle decks. In 2022 Meg's author Grace Duong published Cosmic Creatures Deck (an imitation of Kim's The Wild Unknown Animal Spirit Deck and Guidebook), Ashley Molesso's The Queer Tarot Deck, and in 2023 Grace Duong's Astro Alignment Deck. *Id.,* ¶ 54.

> **TLA'S RESPONSE:** Undisputed as to the publications cited. Otherwise disputed.
> Argumentative, speculative, conclusory, and not based on personal knowledge or any
> other admissible evidence. An agent has no duty to stop representing other authors.

55.     As a result of Meg and TLA's assistance to Kim's competitors, Kim's sales plummeted. *Id.,* ¶ 55; Kass Decl., Ex. K.

> **TLA'S RESPONSE:** Disputed. Speculative, conclusory, and not based on personal
> knowledge or any other admissible evidence.

56.     Before any works resembling Kim packaging and designs were offered in the market, Kim's sales had a growth rate of 54%, climbing from $90,322.266 in 2016 to $323,746.81 in 2018. Krans Decl., ¶ 56; Kass Decl., Ex. K.

> **TLA'S RESPONSE:** Undisputed as to the cited sales figures. Disputed but immaterial
> that works resembling Plaintiff's were not previously published.

57.     Kim's first decline in sales came after 2018, the year Meg and TLA helped Grace Duong publish Mystic Mondays, a tarot deck with design and packaging that imitated mine. Krans Decl., ¶ 57; Kass Decl., Ex. K.

>   **TLA'S RESPONSE:** Undisputed as to sales figures and the fact that Grace Duong was a TLA client in 2018. The implied causation is disputed. It is argumentative, speculative, conclusory, and not based on personal knowledge or any other admissible evidence.

58.     Meg and TLA knew that copying Kim's packaging and designs would be detrimental to Kim's financial success and hold on the market, but they didn't care. Krans Decl., ¶ 58.

>   **TLA'S RESPONSE:** Disputed. Speculative, conclusory, and not based on personal knowledge or any other admissible evidence.

59.     Meg and TLA continued to assist authors in developing products that copied Kim's, and published four imitation decks in 2020. *Id.,* ¶ 59.

>   **TLA'S RESPONSE:** Disputed. Speculative, conclusory, and not based on personal knowledge or any other admissible evidence.

60.     As a result, Kim lost over $183,000.00 in sales. *Id.,* ¶ 60; Kass Decl., Ex. K.

>   **TLA'S RESPONSE:** Disputed. Speculative, conclusory, and not based on personal knowledge or any other admissible evidence.

**Process to Complete Future Works**

61.     Because of Meg and TLA's blatant lack of service and direct support of competitors, Kim was forced to sever the relationship and terminate the Agreement. Krans Decl., ¶ 61.

**TLA'S RESPONSE:** Undisputed as to the fact that Plaintiff terminated the Agency Agreement. The paragraph is otherwise argument and conclusion, not a statement of fact.

62.     After the termination, Kim explained to her business manager Billy Goldberg some of the reasons why she was considering litigation against Meg and TLA. That text message was not an exhaustive and complete list of reasons. *Id.,* ¶ 62.

**TLA'S RESPONSE:** The content of the text message is undisputed. The paragraph is otherwise argument and conclusion, not a statement of fact.

63.     Meg and TLA's behavior has worked to the direct benefit of themselves and Kim's competitors. They are lining their pockets with 15% of the commission of all Kim's previously- published works, and the works of her competitors. They refuse to answer emails, phone calls, attend meetings, or in any way communicate or support the marketing of Kim's existing works – yet they want to continue receiving the 15% commission as if they are still providing the service of an agent. *Id.,* ¶ 63.

**TLA'S RESPONSE:** Undisputed as to the fact that because Plaintiff fired TLA, the agency no longer works for her. The paragraph is otherwise argument and conclusion, not a statement of fact. The Agency Agreement dictates the commission and provides 15 percent on all deals negotiated.

64.     Meg and TLA want to assert a right to 15% of all future editions of existing works. This includes anniversary editions, re-designs, and any future iterations of the existing works. Because of the complex visual nature of Kim's work (each deck and guidebook includes over 200 custom illustrations), any re-design or new edition requires extensive communication, including decisions about the budget, packaging, design, and marketing. Typically the agent is a liaison for these discussions, keeping everyone aligned and on schedule for a successful publication. Meg refuses to help facilitate these new editions, yet claims they should still receive the 15% royalty upon publication. *Id.,* ¶ 64.

**TLA'S RESPONSE:**

- Undisputed as to the fact that because Plaintiff fired TLA, the agency no longer works for her.

- Undisputed that TLA is seeking to have the terms of the Agency Agreement enforced. Rights for "re-designs and future iterations of the existing works" have already been sold to publishers and therefore fall under the Agreement. The paragraph is otherwise argument and conclusion, not a statement of fact.

65.     The Wild Unknown Archetypes Pocket Deck, which is a redesigned travel-sized version of an already existing product, is scheduled for publication in April 2024. *Id.,* ¶ 65.

**TLA'S RESPONSE:** Undisputed.

66.     The Wild Unknown Archetypes Pocket Deck, is a miniature version of the original deck and guidebook, meant to fit in the palm of the hand or in a pocket. This required substantial redesign of the guidebook, the card deck, and the packaging. Instead of a cardboard

constructed rectangular outer box, the new pocket-sized deck is sold only in a miniature circular

tin that can fit in the palm of the hand, approximately 1/5 of the size of the original product.

Therefore, the marketing material and the art files had to be redesigned to fit on the new package

dimensions and aluminum material. Each of the 200+ illustrations that make up The Wild

Unknown Archetypes Deck had to be reformatted for this new miniature size, and approved

before being sent to the printer. This required significant communication between Kim and

Harper Collins, including mailing physical prototypes of the tin containers back and forth to the

printers in China. Meg refused to take part in facilitating this process resulting in the project

release date being delayed by over a year. *Id.,* ¶ 66.

> **TLA'S RESPONSE:** Undisputed as to the fact that because Plaintiff fired TLA, the
>
> agency no longer works for her. The events described in this paragraph all took place
>
> after that termination. The details of the product are undisputed but immaterial to any
>
> issue before this Court. The delay of the project is also immaterial, as well as conclusory,
>
> speculative, and unsupported by personal knowledge or any other admissible evidence.

67.     Although TLA is claiming it is entitled to a 15% commission on all sales related

to the Wild Unknown Archetypes Pocket Deck, TLA has not assisted in overseeing the

production schedule or supporting the success and marketing of this new product. *Id.,* ¶ 67.

> **TLA'S RESPONSE:** Undisputed as to the fact that because Plaintiff fired TLA, the
>
> agency no longer works for her. The events described in this paragraph all took place
>
> after that termination. Also irrelevant to any issue before the Court.

68.     Without a working agent in place there is no current sales or marketing campaign from Harper's team to support the launch of the Wild Unknown Archetypes Pocket Deck in April 2024. With a working agent on board there would be a publicist and sales contact set up at Harper who has the goal of getting this product visible in the marketplace, on social channels, and in press opportunities. TLA has refused to support or mention this product on any social media channels or take part in the campaign for its success. *Id.,* ¶ 68.

> **TLA'S RESPONSE:** Undisputed as to the fact that because Plaintiff fired TLA, the agency no longer works for her. The events described in this paragraph all took place after that termination. The rest of this paragraph is immaterial to any issue before the Court, as well as speculative, conclusory, and not based on any admissible evidence.

69.     Although Meg has tried to dismiss these pocket decks as "ancillary" and insignificant, sales of previous pocket decks have surpassed what many authors and publishers aspire to, making revenue for all parties involved. The last pocket deck Kim released sold 23k units in just a few weeks after release. See Kass Decl., Ex. G. ("I am happy to share that we have sold more than 23k units to date, and our internal team is extremely enthusiastic about the pocket line"); Krans Decl., ¶ 69.

> **TLA'S RESPONSE:** Undisputed as to sales and revenue related to the pocket decks. Vague as to what Plaintiff means by "ancillary," but undisputed that TLA appropriately views the pocket decks as works to which the publishers have all rights as a result of the publishing agreements that cover the primary decks.

70.     Our Agreement only pertained to works for which Meg and TLA rendered services. *Id.,* ¶ 70.

> **TLA'S RESPONSE:** Not a statement of fact—conclusion and argument. The meaning of the Agency Agreement is the key issue in the case, and a legal issue for the Court to decide.

71.     If I want to publish works based on—but materially different than—existing works, I will have to hire a new literary agent/agency to handle the process with the publisher to bring those works to publication. Meg and TLA refuse to render any services. *Id.,* ¶ 71.

> **TLA'S RESPONSE:** Undisputed as to the fact that because Plaintiff fired TLA, the agency no longer works for her. The rest of this paragraph is immaterial to any issue before the Court, as well as conclusory and speculative. The question of whether a work is "different" is immaterial—what *is* material is whether the rights to that work are part of an existing publishing contract.

72.     Accordingly, Kim's new agent/agency will take a percentage of any future works we publish together. *Id.,* ¶ 72.

> **TLA'S RESPONSE:** Immaterial to any issue before the Court, as well as conclusory and speculative. No new agent is needed—or able—to sell or dispose of rights TLA has already sold.

Dated:  New York, New York          Respectfully submitted,
        February 16, 2024

                                    MILLER KORZENIK SOMMERS RAYMAN LLP

                                    By:   /s/ Mona Houck
                                          Mona Houck
                                          David S. Korzenik
                                          1501 Broadway, Suite 2015
                                          New York, NY 10036
                                          mhouck@mkslex.com
                                          dkorzenik@mkslex.com
                                          (212) 752-9200